GARRISON, Judge.
This is an appeal from a judgment of the district court dated June 28, 1983 rendered in accordance with the findings of a Commissioner and granting damages in the amount of $33,033.14 to George Emrick for damages sustained by him as the result of termination of an employment contract with the defendant Pan American Life Insurance Co. (hereinafter “PALIC”). From that judgment, George Emrick has appealed and PALIC has answered the appeal.
The Commissioner filed an excellent report quoted below:
“STATEMENT OF THE CASE
George Emrick sued the Pan-American Life Insurance Company on a petition for breach of contract and for damages. Pan-American filed an answer in which it admits that Emrick was a Managing General Agent under a contract which it avers is the best evidence of the agreement between the parties and denying the balance of the allegations.
*451 FACTS AND OPINION
George Emrick started as an insurance salesman for the PALIC Agency sometime in 1972. He signed a Managing General Agent’s contract July 1, 1976. This contract was terminated October 1, 1980. It is the effect of this termination and the events succeeding such with which this court is concerned.
PALIC marketed insurance principally through two sales systems; a Managing General Agent system in which a person in a given locality set' up an agency. He recruited new salesmen and was responsible for the office overhead to accomo-date them. The hiring of new salesmen had to be approved by PALIC and PAL-IC contributed 80% of a new salesmen salary. This percentage of contribution might extend for as long as 2½ years. PALIC kept a pervasive overview of the agency and could cause the termination of agents at any time. It maintained records of the sales made by such salesmen and the agency as a whole. The overwhelming majority of people recruited to be insurance salesmen do not remain as such and apparently the overwhelming attrition rate was a source of concern in this case to PALIC and its agent, Emrick.
An alternate method of marketing insurance known as the Producing General Agent system was also utilized by PAL-IC and the salesmen are in direct privity with PALIC. Each salesman is responsible for his own overhead in this system. A comparison of the two systems is necessary at this point. A salesman selling under the MGA system would receive $2.00 of every $3.00 commission earned. The remaining $1.00 went to the MGA where it was utilized for agency overhead and personal profit to the MGA himself. The salesmen under a MGA system were required to sell only PALIC insurance. The salesmen under the PGA system may sell insurance for other companies. Applications to purchase insurance by prospective insureds may be offered by PGA’s to several companies. The PGA’s are paid the full $3.00 of earned commissions. Substantial percentages of Pan-American insurance sales came through the MGA system although more was sold through the PGA system.
The PALIC Agency in New Orleans was the Emrick Agency. The Managing General Agent’s contract between PALIC and Emrick does not have a term. It is terminable by either party to the contract at any time. The evidence showed that PALIC decided to eliminate the MGA system and place all salesmen on PGA status. Various MGA’s around the country were terminated and their status converted to PGA’s.
The future of the MGA system was a source of concern to the MGA’s themselves and to their salesmen. PALIC convoked a meeting in Houston in August, 1979 in order to discuss the system. At this meeting it was revealed that the system was more expensive than PALIC wanted it to be, and that it did not produce a 15% “growth”. PALIC did not indicate its intention at this meeting to terminate the MGA contracts for the obvious reason that it did not wish to place a significant portion of its sales system in a state of uncertainty and confusion which would result in what PALIC desired to avoid — a loss in sales of insurance. Even at this time it had commenced closing MGA’s around the country and began converting all to the PGA system.
It did not, however, specifically advise George Emrick that his agency would be terminated and his continuation of sales production under that system at full steam until direct notice was given to him by PALIC was no more than fulfillment of his contract with PALIC.
PALIC formally notified Emrick that his MGA contract would be terminated effective October 1, 1980. This notice of termination was given to him July 22, 1980. PALIC did not, except in one aspect of the termination, treat Emrick badly. It took over Emrick’s lease obligations and telephone contract and it granted to Em- *452 rick the samé right to receive a portion of commissions earned on policies which remained in force for a period of 10 years even though Emrick might sever his connection to PALIC. This “vesting” provision was contractually obligatory on PALIC after an agent remained with PALIC for 10 years or more. At this time of the termination of his MGA contract Emrick was an agent for almost 9 years.
It addition and sometime prior to the notice of termination it made him a Regional General Agent. This type of agency relationship was not explained to the court.
PALIC extended to Emrick a PGA contract which included as a point Emrick’s “overwrite” on commissions earned for a period of two years from sales made by salesmen, now PGA’s who formerly worked for the Emrick Company, which underwrote such salesmen’s expenses of overhead, policyholder services and education, during and after such salesmen were indoctrinated, until Emrick’s MGA contract was terminated.
PALIC, after 11 months, terminated Em-rick’s new PGA contract, and, presumably as an adjunct to it, his two year overwrite on his former agent’s commissions, which then had 13 months to go. It is noted that this termination was made just short of Emrick’s 10 year anniversary of his association with PALIC. The two aspects of the PGA contract with Emrick, 1) the sales effort of Em-rick himself on the one hand, and 2) Emrick’s right to receive an overwrite do not have any rational cause for interrelation between themselves.
However, when the court recognizes that additional monies of Emrick were expended on the recruitment of salesmen during his MGA contract which was terminated, then this expenditure by Pan-American is both reasonable and just. PALIC’s termination of Emrick’s PGA contract and his 2 year overwrite was made because, in the 11 month period during which the contract was in force, Emrick became associated with another insurance company and began selling insurance under a MGA system.
PALIC termed such a position a “conflict of interest”, without, however, explaining why. Emrick, as a PGA, had the right’ to shop applications to buy insurance to any insurance company. The only requirement to maintain his PGA contract with PALIC was a $5,000.00 per annum premium production. PALIC cancelled prior to the lapse of ⅜ year, presuming that Emrick would not meet the minimum.
PALIC’s treatment of Emrick in offering him a PGA contract and an overwrite and in taking over his lease obligation, and his telephone obligation also achieved the direct employment of all of Emrick’s salesmen who were indoctrinated, trained, educated, and nurtured by Emrick in some cases for many years. PALIC had the right to close out the MGA contract with Emrick upon the giving of reasonable notice. PALIC chose to contract away all the damages which may have been sustained by Emrick should either the MGA contract termination be declared illegal or the reasonable time of notice of termination be declared too short. Indeed the ongoing nature of the MGA contract in its day-today execution presented a pervasive supervision by PALIC over Emrick’s agency. PALIC complied with the assumption of the lease obligations and the telephone contract and agreed to cancel the agent’s debit obligations, and impliedly recognized Emrick’s right to receive some equity for the loss of his efforts with respect of his salesmen. This was the cause for the overwrite provisions. Pan-American has not paid the overwrite provisions seeking to avoid liability by attempting to have the court recognize the cancellation of Emrick’s PGA contract on which it adhered the overwrite provisions. PALIC recognized that the cancellation of the MGA contract might give rise to damage claims that arose from various sources. On its part it alleviated the damages on' all but the *453 overwrite provisions. This court cannot permit PALIC to force its relationship with Emrick and its termination of various agency relationships it had with him in purely contractual terms. The court can only postulate whether Emrick would have sued PALIC and PALIC complied with its overwrite agreement. By failing to pay it invited this lawsuit. This court is unwilling to play Pan-American’s game to find that a conflict of interest was a cause of the termination of Emrick’s PGA contract. It is of no interest to PALIC how Emrick shopped applications to buy insurance or whether he, Emrick, prefers to do this in a General Agent’s capacity rather than through a system preferred by PALIC.
For these reasons the court recommends a judgment in the amount of $33,033.14 together with legal interest from October 1, 1982.”
Plaintiff argues that the amount awarded should be increased to cover costs of expanding his insurance agency on the grounds that he was lulled by PALIC into believing that his agency would not be discontinued by PALIC. PALIC argues that it decided to switch from one marketing plan to another and so informed all of its Managing General Agents in person in 1979. Both parties agree that PALIC offered and Emrick accepted employment under the new marketing system. PALIC argues that Emrick was terminated under the new contract as a result of (1) his failure to produce the required amount of sales, (2) decline in general performance resulting from an alleged drinking problem for which PALIC offered to pay the costs of rehabilitation and which Emrick refused, and (3) their later realization that Emrick had accepted employment with another company. PALIC further argues that it voluntarily gave Emrick an overwrite (i.e. commission) on sales of agents that Emrick had trained in order to aid Mr. Emrick in his transition from one marketing system to the other. These commissions totaled $20,089.39.
On appeal, plaintiff makes a number of well-briefed arguments under theories of equitable estoppel, misrepresentation, justifiable reliance, culpa in contrahendo, abuse of rights, and breach of contract. It should be remembered, however, that Mr. Emrick was victorious below. Thus the main question on appeal is did the trial court clearly abuse its discretion in the amount awarded below. Reck v. Stevens, 373 So.2d 498 (La.1979). In light of the Commissioner’s well reasoned and lengthy report and upon an independent review of the record, we cannot conclude that an abuse of discretion in the amount awarded has occurred.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
WILLIAMS, J., dissents.