21 So.3d 1084 (2009)
Donna HOWARD, Individually and on Behalf of her Two Minor Children, Chad Howard and Kendra Howard, Clarence Johnson, Joyce Johnson, Orville Johnson and Helen Johnson.
v.
UNION CARBIDE CORPORATION.
No. 08-CA-750.
Court of Appeal of Louisiana, Fifth Circuit.
October 27, 2009.
Rehearing Denied November 20, 2009.
*1086 Andrew A. Lemmon, Irma L. Netting, Hahnville, LA, and Paula A. Ates, Destrehan, LA, and Roy F. Amedee, Jr., New Orleans, LA, for Plaintiff/Appellee.
David M. Bienvenu, John P. Murrill, Lexi T. Holinga, Baton Rouge, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS, SUSAN M. CHEHARDY, CLARENCE E. McMANUS and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
This is an appeal by Union Carbide Corporation, defendant/appellant, from a judgment fixing damages for randomly selected plaintiffs in this class action suit. The suit grew out of a chemical leak at defendant's plant in Taft, Louisiana. For the following reasons, we vacate two of the awards and otherwise affirm the remaining damage awards.
The leak began at about 10:00 PM on Thursday, September 10, 1998, and it was contained at about 3:00 PM on Friday, September 11. On Thursday afternoon and throughout the next day, Tropical Storm Frances inundated the area with torrential rains. The weight of the accumulated rainwater on the floating roof of a large tank caused the roof to partially collapse. This in turn broke the seal and allowed some of the contents to leak onto the roof and evaporate. The substance in the tank was about 80% petroleum pentanes with a few other carbon compounds making up the remainder. By Friday afternoon plant personnel were able to cover the tank roof with chemical foam and thus stop the evaporation process. Air monitors in the area showed that once the evaporation was stopped, the residual naphtha in the air immediately dissipated.
Suit was filed on behalf of all people exposed to the compounds. At a hearing on the class certification the various experts testified as to the extent and direction of the plume of naphtha, its probable concentration, and its effects on people exposed during the release. At the conclusion of the hearing the trial judge certified the following class:
Those persons living or located between the Union Carbide Plant and the towns of Taft and Killona, including the towns of Taft and Killona, and the residents of the town of Montz, who were present in these locations for some time, from 10:00 PM on September 10, 1998 until 3:00 PM on September 11, 1998, and who experienced the physical symptoms which include any or all of the followingeyes, nose or throat irritation, coughing, choking or gagging, or nausea, as a result of their exposure to naphtha or other chemical substance released from Union Carbide.
By agreement of the parties a trial of thirty randomly selected plaintiffs was held to determine 1) whether claimants were exposed to the naphtha fumes, 2) whether they suffered compensable damages, *1087 and 3) the amount of their damages. One claimant was dismissed for failure to comply with discovery, seven were dismissed for failure to appear at trial, and eight were found not to have been within the class boundaries during the relevant times. The remaining fourteen claimants were given damage awards ranging from $3,500 to $750. This appeal followed.
Union Carbide's argues: (1) The trial court committed manifest error in awarding damages to Franklin McGinnis and Debra Brown due to the lack of any credible evidence that they were present in the area. (2) The trial court committed manifest error in awarding excessive damages ranging from $750-$3,500 to claimants who sustained minor symptoms and required no medical treatment or prescription medication. The exposure did not violate health based exposure limitations. The jurisprudence suggests that damage awards of $0-$200 are appropriate. (3) The trial court committed manifest error in awarding any damages in this matter due to the lack of any medical evidence specifically linking each claimant's symptoms to the alleged exposures.
In Reck v. Stevens, 373 So.2d 498 (La. 1979), the Louisiana Supreme Court pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Reck disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. Reck further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Id. at 1260-61 (Citations omitted). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id.
Youn explained:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
623 So.2d at 1261.

Manifest Error-Clearly Wrong Standard
When factual findings are based on determinations regarding the credibility of *1088 witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Hebert v. Rapides Parish Police Jury, 06-2001, p. 3 (La.4/11/07), 974 So.2d 635, 654 citing Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error even in a finding purportedly based upon a credibility determination. Id. at 844-845.

Debra Brown
In a tort case, the plaintiff must prove by a preponderance of the evidence both the negligence of the defendant and the damages caused by the defendant's fault. Coutee v. Global Marine Drilling Co., 05-0756 (La.2/22/06), 924 So.2d 112, 117 (Citation omitted). Union Carbide argues that Ms. Brown's symptoms, if any, were minimal and there was a lack of credible evidence that she was present where she claimed to be during the naphtha release. Union Carbide also argues that there was no testimony that exposure to naphtha can cause sinus injury.
Debra Brown's deposition was introduced at the trial. Ms. Brown testified that she left her home in Hahnville on Thursday evening to pick up her son from the Waterford Three nuclear plant where he worked. She traveled the River Road and arrived at the roadblock near the Union Carbide plant at about midnight. After what she estimated to be five to seven minutes she was rerouted back toward Hahnville, then south to Highway 3127, and then west to the road going from Highway 3127 to the River Road through Killona. She encountered a second roadblock at the juncture of Highway 3127 and the Killona road, after which she returned home. The maps and evidence show that no portion of Highway 3127 that she traversed lies within the zone of the class certification. Thus, she was in the appropriate zone for at most seven minutes.
At trial, defense counsel pointed out several inconsistencies between Ms. Brown's deposition testimony and her testimony at trial. The trial judge concluded that Ms. Brown suffered from an irritated sinus for approximately five days. However, at her deposition, Ms. Brown testified that her symptoms only lasted 36 hours or one and one-half days. In contrast, at trial, she testified that her symptoms lasted at least five days. The trial judge concluded that "aggravation of her pre-existing sinus condition primarily fixes her damages." But, in her deposition, Ms. Brown testified that she did not know if her sinus symptoms resulted from her exposure to the emission. At trial, although she admitted she sought no medical attention and was able to take a flight to attend a wedding, she nonetheless testified that she believed that her sinus problem was aggravated by the release because her sinus attack was worse on this occasion. In short, her testimony was internally inconsistent regarding the duration and severity of the sinus problem. Also, even accepting as true her trial testimony that she believed the sinus problem was caused by her exposure, that belief is insufficient to establish causation by a preponderance of the evidence.
Ms. Brown also said that after returning home early Friday morning she took a 6:00 AM flight to Chicago to attend a wedding. She said that the weather was fine on her departure from New Orleans even though weather reports showed continuing severe *1089 weather from the tropical storm. Finally, in her deposition she indicated that the above events occurred late Friday night and Saturday morning, well after the time set forth in the class certification, rather than late Thursday night and Friday morning as she claimed at trial.
Considering the above contradictory evidence and testimony, and the fact that at most Ms. Brown may have been in the zone for a mere seven minutes, the trial judge was manifestly erroneous in awarding Ms. Brown damages. Therefore, we vacate the award of $2,500 to this claimant.

Rogest Gross
Mr. Gross testified that he was stopped for two hours at a roadblock where the Killona road meets the River Road. He said that he had gone to his mother's house in Edgard to cut her grass and work in her flower beds on Thursday afternoon (during the tropical storm). He said that he left his mother's house at about 9:30 PM on Thursday night and was proceeding on River Road to his home in Alma when he encountered the roadblock. Mr. Gross stated that he encountered the roadblock around 9:30 PM to 10:00 PM where he waited two hours. He stated that he arrived at his home in Alma about 11:00 PM. Maps of the area showed that Edgard is about eight miles from where the alleged roadblock was encountered. The logs from St. Charles Parish sheriffs office indicate that the first roadblock was not set up until 11:43 PM on Thursday night. It thus would have taken him over two hours to traverse the eight miles from Edgard to Killona. Furthermore, if he were stuck in traffic for two hours, he would not be home by 11:00 PM. This testimony is simply not credible and we therefore vacate the award of $750 to this claimant.

Franklin McGinnis
The trial judge awarded Mr. McGinnis $3,500. Mr. McGinnis testified that he lived in Killona and he lived there at the time of the incident. At the time of the release, he was working the day shift at the Union Carbide plant. He started work around 6:00 AM either on Thursday or Friday during the pertinent time frame. He noticed a strong odor while he worked outside at the plant. The bad odor came through the plant. He saw people vomiting and coughing. He began wheezing and coughing. His eyes burned and he was nauseated. At one point, the plant sounded a siren to stop work. The workers had to go inside a warehouse. He was frightened for a couple of days. He explained that this odor, unlike any other odor he had ever experienced, stood out because it was very strong. He did not know where the odor was coming from. He worked his entire shift and did not recall missing work because of the incident. He thought that his physical symptoms lasted that night and perhaps a couple of hours on the following day. He did not go to a doctor. However, he did get checked out by the first aid person at Union Carbide, who also checked out other people. He took no medication.
Union Carbide points to several inconsistencies both in Mr. McGinnis' testimony and in comparison to his claim form. At trial, Mr. McGinnis testified that he has had congestive heart failure. As a result he takes medication, which makes it difficult for him to remember. He was even uncertain as to the year that he married his wife. At first, he testified that he worked for H.B.Zachary. But on cross-examination, he was referred to his 1999 application for that company. Then, he testified he was working for Fluor Daniel's at the time of the incident. He maintained that he was working as a foreman *1090 at the time. When confronted with the fact that his claim form indicated that he was at his home rather than at work at the time of the incident, he stated that on the form he was merely giving his address.
The trial judge made a credibility determination and accepted Mr. McGinnis' testimony as credible. He evidently found that any discrepancies in his testimony were attributable to poor memory problems. We find no manifest error in the trial judge's credibility determination. Furthermore, for the reasons stated below would conclude that the trial judge did not abuse its discretion in the amount of the damage award. Thus, we affirm Mr. McGinnis' damage award of $3,500.

The Remaining Damage Awards

$1,500 Awards (Killona Residents)
Ella Mae Darrensbourg testified that she was at her home the entire time of the incident. After 10:00 PM on September 10th, she smelled an odor when she opened the door of her trailer and stood outside. She experienced symptoms of burning eyes, sneezing, and coughing. She did not see a doctor. She used Robitussin and Visine. Her symptoms lasted about four days. There were times during the event that she left her trailer to walk to her husband's nearby businessa bar.
Colleen Lathers testified that she was at home the entire evening of September the 10th through September 11th. She smelled a funny odor and experienced headache, nausea, and burning eyes. She was uncertain as to the duration of the eye irritation and nausea. She flushed her eyes with water and took over-the-counter medication but she saw no doctor. The parish forced her to "shelter in place" and she stayed inside. The headache was the most prevalent symptomit lasted a few days.
Tone Silas testified that on the night of September 10th, he was outside the house on the covered porch with other people when he and the other members "started feeling kind of bad." One child vomited. He smelled something like paint thinner in the air. The group went inside. He experienced nausea and took over-the-counter medication. He also experienced eye, nose, and throat irritation. He washed out his eyes. The symptoms did not last long. The following day, firefighters arrived and told them to stay inside. He stated that he did not see a doctor.
Cynthia Johnson-Gordon's deposition testimony was introduced into evidence in lieu of her live testimony by agreement of the parties. Ms. Johnson-Gordon testified that at the time of the incident, around 10:00 PM, her neighbor informed her that there was a spill. The neighbor asked her to go to the neighbor's house. Ms. Johnson-Gordon stated that she, her friend, and her children stayed at the neighbor's house until the next day when everything had cleared and it was safe to return to her home. She explained that her neighbor was concerned about Ms. Johnson-Gordon because Ms. Johnson-Gordon had health problems and lived in a trailer that had no air-conditioning. Ms. Johnson-Gordon stated that she smelled something unusual that night. Although she had previously smelled fumes from the plant, this episode was different. This time, her eyes burned. As a result of the incident, she experienced burning eyes, burning nose, stomachache, nausea, headache, and coughing. Her eyes started to burn when she stepped outside. She used cold compresses on her eyes. Her eyes stopped burning after a couple of hours. That night her nose burned for a couple of hours. She did not take medication for that symptom. Her stomachache and nausea lasted a few hours. She took Pepto-Bismol for those symptoms. She had a *1091 headache that night and the following day. She took no medication for the headache. She does not take aspirin. Her coughing lasted perhaps 30 minutes. Her throat burned. But, she just drank cold water. She did not see a doctor. She did not miss work because of the incident. She had two days off before she had to return to work.

$2,000 Awards (Montz Residents)
June Gross testified that she was at home when she became aware around 1:00 AM or 2:00 AM on September 11th that there was a broadcast over the television to stay inside until further notice. She did not recall whether she smelled anything unusual. Later that day, she had eye irritation or burning of her eyes. She used rosewater for her eyes. Her eyes burned a day or two. She did not see any doctor. She had no other symptoms. She thought she went to work the following day.
Dorothy Richard testified that at the time of the incident, she worked the evening shift from 2:00 PM until 10:00 PM at the Postal Service located at the airport. When she arrived home from work on the evening of September 10th, her neighbors told her there was an explosion and people were instructed to remain inside. She noticed an odor when she arrived home. She experienced nausea, gagging, burning eyes, throat irritation, and coughing. She was frightened for a day or two until she learned that it was safe to go outside. Her physical symptoms lasted a day or two. She went to work the following day and worked the entire day. She used over-the-counter medicationsPepto Bismol, Tylenol, and Visine. She did not go to a doctor. She did not miss work as a result of the incident.

$2,500 Award (Entergy Plant)
Lisa McKnight testified that on September 10th and 11th she worked a daytime schedule at the Waterford Three Entergy Plant. She started work around 6:30 AM. On Friday September 11th, while traveling to work, she noticed an unusual odor. The odor lasted throughout the day. After smelling the odor, she experienced burning eyes, coughing, gagging, and nausea. Her plant has a first aid station but she did not use the aid. Her eyes burned for about two weeks. The other symptoms resolved within one to two days. She took over-the-counter medication for her symptomsEmetrol, Tylenol, and Visine. She did not go to a doctor. She never missed work as a result of the incident. She worked around chemical plants for a long time but never experienced the severe eye irritation she experienced for the current release.

$3,500 Awards (Occidental Plant)
Martin Granier, Anne Ockmond, and James McCormick testified that the Occidental Plant is across the street from Union Carbide.
Martin Granier testified that at the time of the release, he worked for River Parish Maintenance at the Occidental Plant. At that time he worked from 6:00 PM to 6:30 AM. At approximately 1:00 AM on September 11th, he began to smell an odor. As time wore on, the smell worsened. The odor caused him to choke. Next, his eyes watered and he developed a runny nose, sore throat and nausea. He worked his entire shift from September 10th to September 11th. The symptoms lasted a couple of days. He did not go to a doctor or take anything. Also, Occidental had eye wash and first-aid areas, which he did not utilize. He explained that he saw a whitish cloud come across the plant from Union Carbide and felt something on his skin.
Lionel Harry testified that he was working outside as a scaffold builder at the Occidental Plant at the time of the incident. *1092 He worked a shift of 6:00 PM on September 10th to 6:30 AM on September 11th. He noticed workers complaining of a smell. He did not see anything in the air. He smelled an odor unlike anything he had ever smelled before. Around 2:00 AM or 2:30 AM, his eyes watered and later on he had a headache. His eyes watered until he got home. His headache lasted a couple of days but the headache lessened the next day. He took aspirin and did not see a doctor. He completed his shift. He did not feel the need to seek first aid at the plant that evening.
Anne Ockmond testified that at the time of the incident she was working at the Occidental Plant. She became aware of the odor on September 11th when she went to work her schedule of 7:00 AM to 7:30 PM. She noticed a very strong, pungent odor. She did not, however, notice anything unusual in the air. She described her symptoms as minor. After noticing the odor, she developed eye, nose, and throat irritation as well as nausea. The symptoms occurred when she was at the plant. She worked both inside and outside the plant. At trial, she testified that the symptoms lasted a few days but when referred to her deposition, she admitted that she previously testified that the symptoms lasted one day. She never missed work. She did not recall using the first aid station at Occidental. She saw no doctor. She did not recall whether she took medication.
James McCormick testified that he was working at the Occidental Plant on September 10th and September 11th. He worked from 6:00 AM to 6:30 PM. When he arrived at work on the 11th, he noticed a smell. Shortly thereafter, he experienced eye, nose, and throat irritation. He also experienced a headache. He took aspirin for his headache. He stated that he either obtained the aspirin from his locker or from the nurse at Occidental. However, he also testified that he never went to the first aid clinic at Occidental to request assistance for his symptoms. He worked outside the entire day. The symptoms probably lasted a couple of weeks. He did not go to the doctor. He did not miss work as a result of the incident.

Discussion
Union Carbide argues that the trial court's general damage awards to claimants in amounts that ranged from $750 to $3,500 are excessive. It asserts that jurisprudence requires that the minor, temporary, irritant symptoms described at trial, limited to a duration of no more than approximately one day and requiring no medical treatment whatsoever, should be valued at approximately $0-$200 (depending on the circumstances of individual claimants). Union Carbide also argues in brief that the maximum award should be $750.[1]
In the present case, the trial judge gave a well-reasoned judgment, tailoring each award to the injuries suffered by each plaintiff in accordance with the plaintiffs proximity to the source. Dr. John B. Sullivan Jr., a medical toxicologist, who was accepted as an expert in the fields of medical toxicology and environmental health, testified that it was reasonable that someone closer to the source would receive a higher concentration than someone further away. For example, he stated that people closest to the release in Taft would suffer more acute symptoms than people further away. Thus, there was evidence to support *1093 the trial judge's finding that those claimants closer to the source sustained greater injuries.
The trial judge evidently attached great weight to Dr. Sullivan's testimony that the complaints did not require any sort of medical treatment. Dr. Sullivan testified that the standard kind of treatment is what these individuals did such as using Visine. Dr. Sullivan also testified that there was no doubt in his mind that an exposure to naphtha at certain concentrations could produce the symptoms that the complainants reported. In his opinion, an acute onset of symptoms would induce some irritation of the eyes, nose, and throat.
Dr. William Nassetta's deposition was introduced at the current trial. Dr. Nassetta, an expert in occupational medicine, testified that usually people experience irritant types of effects from exposure. These are stinging in the eyes, tearful eyes, and stinging in the membranes that line the nose. A person could get a sore throat or experience coughing. The other types of effects that one commonly sees with naphtha would be a central nervous system reaction. Naphtha is a central nervous system depressant and one could see some non-specific central nervous system signs or symptoms such as headaches, nausea, dizziness, and almost a sensation of feeling drunk. Dr. Nassetta stated that there could be a plume release within inches of a person and that person may not have any effect but a person nearby could have a very significant effect.
Dr. Sullivan testified that generally if the exposure is terminated, the symptoms resolve within minutes. However, the event in this case lasted 17 hours. Dr. Sullivan stated that with 17-hour exposure, the symptoms may take a day to disappear rather than minutes.
On the other hand, Dr. Nassetta testified that the event might have lasted as long as 70 hours after the plant contained the leak with foam. Thus, there might have been smaller exposures after 17 hours.
Based on the record before this Court, the general damages awarded to the above claimants are not beyond that which a reasonable trier of fact could assess for the effects of these particular injuries to these particular plaintiffs under these particular circumstances.

Decree
Accordingly, given the trial judge's vast discretion in this matter, we affirm the damage awards to Ella Mae Darrensbourg ($1,500), Colleen Lathers ($1,500), Tone Silas ($1,500), Cynthia Johnson-Gordon ($1,500), June Gross ($2,000), Dorothy Richard ($2,000), Lisa McKnight ($2,500), Martin Granier ($3,500), Lionel Harry ($3,500), Anne Ockmond ($3,500), James McCormick ($3,500), and Franklin McGinnis ($3,500).
Finding manifest error, we vacate the trial court's damage awards to Debra Brown ($2,500) and Rogest Gross ($750).
AFFIRMED IN PART; VACATED IN PART.
DUFRESNE, C.J., concurs in part and dissents in part.
McMANUS, J., concurs in part and dissents in part.
DUFRESNE, C.J., concurring in part and dissenting in part.
I concur with the majority opinion vacating the damage awards to Debra Brown and Rogest Gross.
However, I dissent from the amount of damages awarded to the various groups of plaintiffs and would reduce those damages as follows:

*1094 Occidental Plant Employees from $3,500 to $500 each;
Killona Residents from $1,500 to $100 each;
Montz Residents from $2,000 to $150 each; and
Entergy Plant Employees from $2,500 to $250 each.
Although the trier of fact has vast discretion in fixing damages, the award as affirmed by the majority are excessive considering that none of the plaintiffs ever sought medical treatment, none missed any work because of their symptoms, and none complained of any continuing problems due to their exposure to the chemical.
Considering all of the evidence of record I respectfully concur in part and dissent in part.
McMANUS, J., concurs in part and dissents in part for the reasons assigned by DUFRESNE, C.J.
NOTES
[1] An example of a case in which the appellate court affirmed higher awards for what Union Carbide characterizes as minor injuries for which the claimants did not seek medical attention is In re New Orleans Train Car Leakage Fire Litigation, 00-1919 (La.App. 4 Cir. 4/20/05), 903 So.2d 9, writ denied, 05-1297 (La.2/3/06), 922 So.2d 1171.