CHEHARDY, Judge.
Plaintiff, Tyronne Thompkins, instituted this suit for total and permanent disability benefits, and penalties and attorney’s fees under the Louisiana Worker’s Compensation statutes. Named defendants were his employer, Sewell Plastics, Inc., and its compensation insurer, National Union Fire Insurance Company of Pittsburg, Pennsylvania. Following trial on the merits judgment was rendered in favor of plaintiff for total and permanent benefits in the sum of $140 per week beginning August 28, 1979, and provable medical expenses since institution of this lawsuit (August 15, 1985). Plaintiff’s prayer for attorney’s fees and interest for arbitrary and capricious denial of his claim was denied.
Defendants have appealed from the judgment.
Plaintiff was employed as a utility worker by Sewell Plastics, Inc. It is undisputed that he was injured in the course and scope of his employment on October 12, 1980, when he fell from the ceiling, a distance of about 25 feet, to the concrete floor while cleaning pipes in the ceiling area. He sustained a fracture of the right distal radius and ulna (wrist), fracture of the right pubic ramus (pelvis) and a torn medial meniscus of the right knee.
Plaintiff was taken to East Jefferson Hospital where he was seen by Dr. Joseph Rauchwerk, an orthopedic surgeon, and hospitalized from October 12 to November 23, 1980. He was readmitted to the hospital on January 11, 1981 until January 19, 1981 for a right knee arthroscopy and a lateral meniscectomy. He was followed as an outpatient thereafter by Dr. Rauchwerk until August 25, 1981, when he was discharged to return to work without limitation of any sort. Weekly compensation benefits at the rate of $110.67 per week were paid through August 25, 1981. The doctor discharged plaintiff at that time with a 7% disability of the right knee injury and 5% disability for the rest of his injuries. The wrist and hip injury had cleared and plaintiff’s only remaining complaint concerned his knee.
Plaintiff returned to Sewell but was not rehired at that time because the doctor’s discharge slip had mistakenly indicated plaintiff had a 70% disability of the right knee and the lady in the employment office was concerned he could not do the work with such a high rate of disability. It was later established that this was an error of the doctor’s staff, but plaintiff never returned to Work at Sewell, expecting that there was no need to do so because he claims to have been told that they would call him.
On April 20, 1982, plaintiff returned to Dr. Rauchwerk complaining of pain in the *667 right knee. Plaintiff was again discharged to return to his usual gainful employment with no restrictions. Because of continued complaints a second arthroscopy examination was recommended on March 3, 1983.
Plaintiff was examined on December 28, 1982 by Dr. V.J. Zeringue, who concluded plaintiff had an 11% disability of the right knee, a 7% disability of the hip and a 5% disability of the leg, for a total disability of 23% to the lower right extremity, translated to a 10% disability of the whole man. It is noted that this is merely a functional disability in accordance with technical tables promulgated by the AMA and has no actual bearing on plaintiffs capacity to work on a regular basis.
Plaintiff was 20 years old at the time of the accident. He had quit school in the eleventh grade and taken a job at Avondale Shipyard where he worked briefly as a laborer. He then worked as a laborer at a grain elevator before taking a job with Sewell Plastics in August 1980. His duties as a utility man principally involved keeping the machine operators supplied with plastic material to make the base cups for two litre coke bottles, plastic milk jugs and Clorox bottles. Plaintiff would like to get a job with a local ambulance company and has taken a CPR course, but claims he is unable to do the work.
Plaintiffs work history is one of laboring jobs that he has worked at for only a few months both before and after the accident. He worked at River Parish Maintenance for three months as a security guard, at a vacuum service for “several days” and at A-3M for two and a half months.
Plaintiffs current complaints are that he cannot bend the right knee fully, that it aches and gives him a lot of pain about twice a week. He worked as a guard at a parking lot after the doctor said he could return to work, but claims his knee hurt. He also stated he cannot lie on his right side because he can feel the bones sticking out on his right hip.
Plaintiff claims he cannot walk for a long period of time and is unable to do any climbing; this interferes with his ability to get a job. He claims to have Charley horses in his leg but has never told the doctor about them, and now claims his hip is bothering him constantly.
Plaintiff admitted all of his medical bills had been paid to the date of trial and that he had received compensation for three or four weeks after he was discharged from the hospital after his last arthroscopy in April 1983. He also admitted the doctor had prescribed therapy and exercise to build up his leg, but he did not do the exercise because he did not think it helped.
Plaintiffs wife, friends and neighbors testified relative to plaintiffs difficulties with his knee and his complaints.
The trial court in reasons for judgment stated that plaintiff had massive injuries as a result of his accident, that he was handicapped by an apparent lack of ambition, that he finished the eleventh grade with no technical training, and that he had no previous long-term employment. The court found the odd-lot doctrine applicable in the instant case and concluded a combination of the injuries resulted in total permanent disability inasmuch as plaintiff is not suited to any type of common labor because of his knee injury and the restrictions plaintiff has imposed on himself.
The judge leaned heavily on the fact that Sewell Plastics refused to re-employ plaintiff and on the medical testimony of Dr. Zeringue, who concluded plaintiff had a 23% disability of the lower right extremity. The court stated that plaintiff had apparently convinced Dr. Zeringue that on days of light duty he is in substantial pain and that this evidence is sufficient to support the judgment.
The court further stated if plaintiff had merely sustained soft tissue injuries and given the same complaints four years later, he would be less inclined to believe him; however, in view of his three serious injuries and his previous injury-free work history, the trial court found no reason to disbelieve plaintiff on this occasion.
Appellant contends the trial court erred in (1) awarding benefits beyond those al *668 ready paid and, alternatively, (2) utilizing the wrong date of the accident; (3) using the wrong weekly compensation rate; (4) awarding any benefits beyond those already paid; and (5) failing to recognize amounts already paid as weekly benefits and medical expenses.
They also contend the court erred in placing any reliance on the testimony of Susan Smith (who testified as an expert occupational therapist and vocation evaluator); allowing any witness to testify that plaintiff was at a disadvantage in competing in the labor market; and contending the district judge erred in relying on evidence that he had excluded at the time of trial.
Relative to appellant’s first contention, the applicable statute concerning total and permanent disability in effect at the time of the accident [LSA-R.S. 23:1221(2) ] provided as follows:
“For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation is that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of the injury, was particularly fitted by reason of education, training and experience, sixty-six and two-thirds per centum of wages during the period of such disability.”
As pointed out by defendants, our courts have routinely held that total permanent disability refers to the inability by reason of injury to engage in any gainful employment, and does not mean the mere inability to obtain employment. Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La. 1983); Kirkley v. DSI Transports, Inc., 416 So.2d 584 (La.App.1st Cir.1982).
Our courts have expanded the traditional notions of inability to work to include workers who are able to do some work, but only in substantial pain. These workers are referred to as odd-lot workers and the trial court stated: “It is a person such as Tyr-onne Thompkins for which the odd-lot doctrine was developed.”
It is clear from the jurisprudence that a worker who is in some discomfort is not an odd-lot worker, even though it is not necessary for an employee to work in significant pain.
One is an odd-lot worker when:
“ * * * because of his physical impairment, mental capacity, education, training, age, availability of employment in his area, and any other relevant factor, that he ‘cannot perform the substantial and material parts of some gainful work or occupation with reasonable continuity.’ * * * ” Oster v. Wetzel Printing, Inc., supra, at 1323, 1324.
As stated by our Supreme Court in Culp v. Belden Corp., 432 So.2d 847, 850 (La.1983):
“ * * * [I]n compensation situations where pain is the linchpin to make out a prima facie case for a worker’s classification in the odd lot category, the pain accompanying routine physical tasks and attempts to return to work must be substantial, serious, intense and/or severe. * * * ” (Emphasis added.)
Defendants claim the pain experienced by plaintiff is not such as to make work an overburdening task, or so substantial, serious, intense and/or severe to limit the types of work available to him and greatly diminish his ability to compete in the job market.
To determine whether or not this is so we review the testimony of Dr. Rauchwerk and Dr. Zeringue, the two orthopedic experts.
Dr. Rauchwerk testified by deposition relative to his treatment of plaintiff following the accident. He described the patient’s injury to his right wrist, hip, ribs and right knee. The doctor had reduced plaintiff’s fractured radius under local anesthesia. Plaintiff had fractured the styl-oid (the small piece of the extension of the arm) and the radius, “which is very, very important.” The wrist fracture healed “superbly well” and there was no pain or loss of function.
*669 Plaintiff also had a fractured pubic ra-mus, part of the important ring where the socket starts to form to the right leg. It was broken, but not displaced. This was a benign injury of no real consequence.
The patient was discharged on October 22, 1980 and readmitted January 12, 1981 for a right lateral meniscectomy. He was discharged on January 19 and seen on October 30, 1981 and nine other occasions until February 26, 1981. He received a 7% disability (a typographical error indicated 70%) for the knee and 5% for the rest of plaintiffs injuries. Plaintiff was found to have post-traumatic arthritis and was complaining of a little bit of pain. He has tremendous atrophy of the quadriceps mechanism. The right leg has wasted a lot because of lack of activity, lack of therapy, and a home program he could follow but did not.
The doctor found plaintiff should be able to return to work but he will have soreness if he climbs. Dr. Rauchwerk stated plaintiff was going to have disability no matter what the doctor does and such disability will affect his every day duties because he will have pain and discomfort while lifting, working or doing his regular job, although not every day.
The doctor concluded if plaintiff could not walk, climb or do ordinary activities it was because he had not been doing the prescribed exercises. He needs intensive physical therapy, meaning a home program, because he has to build muscle around the knee. This doctor was of the opinion plaintiff could work a full 8-hour day in spite of findings of chondromalacia and that he should have no trouble standing 8 hours per day. However, he indicated anyone with post-traumatic arthritis will have pain.
Dr. Zeringue testified he first saw plaintiff on December 28, 1982. Plaintiff complained of right hip and low back pain. A history was taken and the doctor became aware of the fact that plaintiff fell from the ceiling and dislocated his right hip and knee, and had later knee surgery and excision of the meniscus cartilege. Dr. Ze-ringue had seen the operative report of Dr. Rauchwerk and was aware of his diagnosis of fracture of the pubic ramus, fracture of the right distal radius, an articular fracture of the right wrist, internal derangement of the right knee, cartilege tear, and a closed reduction of the upper right extremity.
When seen two years after the accident Dr. Zeringue found evidence of the fracture of the right hip.
When the doctor saw plaintiff on January 17, 1985 he was walking with a limp. The right leg was a half-inch shorter than the left leg, and plaintiff was tender over the right hip. The range of motion was decreased below normal in the extension of the hip. He had limitation of flexion on the right knee, with difficulty in bending. He was restricted in his ability to bend while standing with decreased ability to squat and kneel.
The doctor concluded plaintiff had either tightened ligaments and scarring in the knee or a mechanical bone block in the knee that prevented flexing to the normal limit. Tenderness over a band in the knee, known as the plica, was causing a problem.
Circumference measurements indicated plaintiff still had some inflammatory process in the knee which indicated soft tissue damage and possible injury to the ligaments. Because of these occurrences, plaintiff was having to place unusual stress on other structures of the knee. This caused irritation, inflammatory reaction, increased bulkiness and an increase in the size of the right knee. The doctor recommended plaintiff avoid climbing, kneeling and squatting. He also concluded plaintiff would develop arthritis earlier than he normally would, because of the trauma.
The hip appeared to be healing well, but not in the same alignment, so the weight bearing surface has changed somewhat.
Dr. Zeringue gave plaintiff a disability rating of 11% for the knee, 8% for the hip and 5% for the leg length discrepancy, for a total disability rating of 24%, equated to 10% disability of the whole man. He stated that plaintiff could not return to the work *670 he had been previously performing at Se-well. The doctor had seen plaintiff around the emergency room of the hospital and observed that he was unable to perform the tasks there because the job was very strenuous and plaintiff was at a substantial disadvantage.
Dr. Zeringue did not conclude plaintiff was unable to work and felt he could serve as a member of a highway crew cutting grass, picking up litter or pushing or riding a lawn mower, but he could not perform the duties of a porter in an office building as that actively would cause harm to the joint, muscles and bony structures. He found minimal functional impairment in December 1982 and in January 1985, and recommended that plaintiff try to use his leg more. Under certain circumstances he concluded plaintiff could work as a laborer for 40 hours without substantial pain or damage to himself.
It is clear that Dr. Rauchwerk and Dr. Zeringue differ on plaintiffs ability to work without pain, but the trial court chose to believe plaintiff and the lay witnesses, and was particularly impressed with Dr. Zeringue’s testimony.
In view of the much discretion afforded the trial judge we are unable to find manifest error in his finding that plaintiff is unable to work without substantial pain. Reck v. Stevens, 373 So.2d 498 (La.1979).
We do however agree with appellant’s second and third contentions. The trial court awarded compensation benefits beginning August 28, 1979. Since the accident did not occur until October 12, 1980, this earlier date is clearly erroneous. The award of compensation in the sum of $140 weekly is likewise an error.
The reasons for judgment indicate the compensation award was based upon a wage rate of $4.50 per hour for a work week of 30 to 36 hours. While this was the rate testified to by plaintiff, it was stipulated in pre-trial memoranda that plaintiff was making $4.15 per hour.
Giving plaintiff the benefit of the doubt and utilizing a 40-hour work week, as plaintiff suggests, yields a compensation rate of $110.67 per week, the appropriate compensation rate, and the figure upon which prior compensation payments were made, as previously acknowledged by plaintiff.
The judgment will be corrected accordingly in both respects.
Defendant is likewise entitled to credit for medical benefits and compensation payments previously made. Plaintiff introduced payment records in evidence which acknowledge that he has received compensation in the sum of $8,575 paid on a wage rate of $110.67 following the injury but prior to the arthroscopic surgery in March 1983, and plaintiff testified that he was paid from the date of the second surgery until he was again discharged by Dr. Rauthwerk on May 16, 1983.
Defendants complain the trial judge awarded plaintiff all outstanding medicals without mentioning that all medical expenses had been paid, as stated by plaintiff. Defendants are, of course, entitled to credit for all expenses paid. It appears to us that in awarding all outstanding medical bills the judge intended to award only those bills which were unpaid. However, we will clarify the judgment at defendants’ request.
As to the errors of a general nature of which defendants complain, we find no evidence that the trial judge paid undue attention to the testimony of Susan Smith. No doubt he took into consideration the testimony of all of the experts, but in his reasons he clearly indicates that he was principally impressed with the testimony of Dr. Zeringue.
Nor do we agree that the trial court’s conclusion that plaintiff was unable to compete in the labor market was based upon inadmissible evidence of Dr. Zeringue, whom defendants contend is unable to testify in that regard since he is not a vocational counselor, employer, or personnel manager.
There was ample evidence in the record for the trial court to arrive at an independent determination of that fact without re *671 lying on Dr. Zeringue’s testimony. It appears to us that the trial court could properly be considered its own expert in that area, having heard all of the testimony of various witnesses as to plaintiff’s physical disabilities which would affect his ability to compete in any labor market.
We seriously doubt the trial court relied on Ms. Smith’s testimony in that regard as we agree her testimony was confusing and unimpressive.
We also agree with defendants that the trial court’s reliance on Sewell’s refusal to re-employ plaintiff was not correct. Dr. Rauchwerk’s deposition makes it clear that there was a typographical error in his disability evaluation (i.e. 70% instead of 7%) and plaintiff indicated the degree of disability incorrectly reported was the reason he was not rehired when he went back initially. Plaintiff knew the error had been corrected, but never returned.
Nevertheless, the judge’s reliance on that refusal is insufficient to negate his finding that plaintiff was totally and permanently disabled based upon other competent evidence.
For the reasons assigned the judgment appealed from is amended to award plaintiff total and permanent disability benefits of One Hundred Ten and 67/100 Dollars ($110.67) per week beginning October 12, 1980, subject to a credit for all compensation and medical benefits previously paid.
In all other respects the judgment appealed from is affirmed.
AMENDED AND AFFIRMED.