502 So.2d 202 (1987)
Jerry J. BONNETTE, Plaintiff-Appellant,
v.
K-MART, INC., et al., Defendants-Appellees.
No. 86-184.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
*203 Bennett, Bennett and Bennett (William J. Bennett), Marksville, for plaintiff-appellant.
Gold, Simon (Thomas K. Brocato), Alexandria, for defendants-appellees.
Before DOMENGEAUX, GUIDRY and KNOLL, JJ.
GUIDRY, Judge.
Plaintiff, Jerry J. Bonnette, brought this action against K-Mart, Inc. and the manager of its Alexandria store, David Shultz, to recover damages which he allegedly sustained as a result of a slip and fall accident. A jury found defendants partially at fault and assessed damages against defendants in the amount of $2,600.00, but reduced such amount in accordance with their finding that plaintiff was guilty of 50% comparative fault. Judgment was rendered accordingly.
Plaintiff appeals the judgment urging that the jury erred in finding him guilty of comparative fault and also in awarding him inadequate damages. Defendants have neither appealed nor answered the appeal.

FACTS
The facts surrounding the accident in question are basically undisputed. On October 31,1983, at approximately 10:00 a.m., plaintiff, along with his girlfriend, Melinda Lachney, and her father, Colton Lachney, entered the K-Mart store in Alexandria. Colton Lachney was shopping for clothes and parted from the other two once they entered the store. Jerry was looking for work boots, as he had just secured a job as a carpenter's helper some three or four days previously. As Jerry and Melinda walked near the jewelry counter, Jerry slipped and fell to the floor, striking his head and allegedly injuring his neck and back. It is undisputed by all parties that there existed a puddle of water and ice in the immediate area of Jerry's fall.[1] Following the fall, Jerry remained flat on his back, trembling, sweating and screaming about the pain in his neck and back.

*204 NEGLIGENCE
The trial court found plaintiff and defendants equally at fault in causing the accident. Defendants did not appeal or answer the appeal of plaintiff. Therefore, the finding that defendants were guilty of fault is final, the only issue remaining being whether defendants are guilty of greater fault than that assigned by the jury. In this connection, plaintiff-appellant contends on appeal that the jury erred in finding him to be 50% at fault.
A storekeeper in Louisiana has an affirmative duty to exercise reasonable care to keep his floors in a safe condition for those who come on his premises. Although he is not the insurer of the safety of his patrons, he must use ordinary care and prudence to provide reasonably safe conditions. Edmond v. Market Basket Stores, Inc., 479 So.2d 1020 (La.App. 3rd Cir.1985); Taylor v. Kroger Co., Inc., 449 So.2d 1175 (La.App. 2d Cir.1984).
Once it is established that a foreign substance was on the store's floor which caused the plaintiff to fall and sustain injury, the burden shifts to the defendant store owner to exculpate himself from negligence. Gonzales v. Winn-Dixie Louisiana, Inc., 326 So.2d 486 (La.1976); Arch v. The Great Atlantic and Pacific Tea Co., Inc., 477 So.2d 896 (La.App. 4th Cir.1985).
In Gonzales, supra, the Supreme Court set forth the duty of store owners as follows:
"The duty of a store owner to protect his customers from foreign substances on the floor is one of reasonable care under the circumstances. Reasonable protective measures, including periodic inspections, must be taken to keep the aisles and floors free of substances or objects that may cause customers to fall. Kavlich v. Kramer, La., 315 So.2d 282 (1975); Tripkovich v. Winn-Dixie of Louisiana, Inc., La.App., 284 So.2d 80 (1973); Fontanille v. Winn-Dixie Louisiana, Inc., La.App. 260 So.2d 71 (1972), cert. denied, 261 La. 1064, 262 So.2d 44 (1972); Prosser, Law of Torts, § 61, pp. 392-393 (4th ed. 1971). The circumstances that determine the reasonableness of protective measures include the type and volume of merchandise, the type of display, the floor space utilized for customer service, the nature of customer service, and the volume of business. As we recently noted, the self-service grocery system requires customers to focus their attention on the shelves and to handle merchandise. The system increases the risk of harm from objects dropped on the floor by customers and, correspondingly, the duty to minimize the risk by frequent inspections and clean-ups. See Kavlich v. Kramer, supra; Prosser, Law of Torts, § 56 p. 349 (4th ed. 1971)."
In the instant case, it is undisputed that there existed a puddle of water and ice on the floor where plaintiff fell. Although no one actually saw Jerry fall, it can be inferred from the evidence that the aforementioned condition caused his fall.
Jerry stated at trial that, although he doesn't remember where he was looking at the time of the accident, he did not see the puddle of water prior to his fall. Melinda testified that she was looking straight ahead when Jerry fell, but that she saw him go down from the corner of her eye. Melinda testified as to the existence of the water and ice on the floor and stated that Jerry was lying in the water. She testified that Jerry was wet when she went to his aid after the fall. Faye Dryden, a shopper in K-Mart at the time of the accident, also testified at trial. Dryden stated that she was approximately six to eight feet away from Jerry when she heard him fall. When she looked in his direction, she saw Jerry lying flat on his back. She noticed the "wetness" on the floor around him. Defendant, Shultz, also admitted that when he arrived at the scene of the accident, there was "a little bit" of ice and clear liquid on the floor near Jerry.
Considering the above, we conclude that the plaintiff established that there was a foreign substance on the floor at K-Mart which caused him to fall and sustain injury. Therefore, the burden shifted to defendants *205 to exculpate themselves from liability by showing that their employees knew of no hazard on the floor and that reasonable steps to discover and correct any such hazard had been taken.
Shultz testified at trial as to the cleanup procedures utilized at the K-Mart store. Shultz stated that the entire floor had been swept, mopped, waxed and buffed on Sunday, the day before the accident. Shultz explained that when a spill is observed by an employee, a stock boy is immediately called to the area to clean it up. The area is then either watched by an employee or blocked off until the stock boy arrives with a mop. Shultz stated that the store did not have a policy of routine periodic inspections for spills or other hazards, but rather all employees were instructed to be on the constant lookout for any dangerous condition. There had been no report of a spill on the morning of the accident.
Shultz also stated that at the time of the accident there existed a cafeteria in the K-Mart store which furnished ice and soft drinks for customers. The store and cafeteria opened at 9:00 a.m. The accident in question occurred between 9:45 and 10:00 a.m. Shultz estimated that there were perhaps 55 to 65 employees in the store on the morning of the accident with between 30 to 40 shoppers in the store. Shultz explained that the employees were not allowed to eat or drink on the floor while they were working. Although Shultz stated that there should have been one to two employees working in the area of the accident at that time, there was no evidence presented at trial to show that any inspection had actually been made of the aisle in the jewelry department after the store opened at 9:00 a.m. Nor was there any evidence presented that any employee had even been in the area of the accident that morning. Aside from the fact that there was still ice remaining on the floor, there is absolutely no evidence to indicate how long the spill remained on the store floor undetected. For this reason, we find that defendants have failed to exculpate themselves from liability in the instant case.
In Brown v. Winn-Dixie Louisiana, Inc., 452 So.2d 685 (La.1984), the Supreme Court stated:
"One of the reasonably expected risks inherent in the operation of a large self-service supermarket is that an employee or a customer will cause a substance on display to fall or to spill onto the floor and thereby create a hazard to customers subsequently shopping in the area. Because of this, the operator has a high duty to discover unreasonably dangerous conditions existing on the premises and to take reasonable steps to prevent injury resulting from the condition. An operator who never conducts inspections is unlikely to discover unreported hazards. Under such circumstances, the lack of inspections and other preventive measures results in the failure to discover dangerous conditions and contributes substantially to the causation of the ensuing fall and injury."
Although K-Mart is not a supermarket, it has many of the qualities inherent in a supermarket which necessitates the implementation of routine inspection procedures. Due to K-Mart's failure to properly inspect its premises and detect the dangerous condition in the instant case, K-Mart has failed to exculpate itself from the presumption of negligence. It goes without saying that, unless the evidence reflects some fault on the part of plaintiff, defendants are solely responsible for the damages which plaintiff sustained.
We find that the jury clearly erred in finding plaintiff to be 50% at fault since there was absolutely no evidence presented indicating that plaintiff saw or should have seen the puddle of water and ice on the floor. As stated in Serean v. Schwegmann Brothers Giant Super Markets, Inc., 405 So.2d 553 (La.App. 4th Cir.1981), "... shoppers are attracted by displays of merchandise, even merchandise that the shopper had not previously intended to buy. The storekeeper cannot seek for itself the benefit of impulse buying from *206 those displays while arguing that the shopper has a duty not to look at those displays". We therefore reverse the jury's finding that plaintiff was 50% comparatively negligent and hold defendants to be solely at fault.

QUANTUM
Appellant contends that the trial court erred in awarding him $2,600.00 in damages. He argues that this award is inadequate.
At the time of the accident, Jerry was 19 years old and in good health. He had no previous injuries to his neck or back. Immediately after his fall, an ambulance was summoned which arrived shortly thereafter and transported him to Huey P. Long Memorial Hospital in Pineville. X-rays were taken of Jerry's neck and back which revealed no fractures or dislocations. Jerry was thereafter examined by an orthopaedist who diagnosed his condition as an acute cervical and lumbar strain and recommended bed rest and heat treatments. Jerry was also given prescriptions for pain relievers, muscle relaxants and anti-inflammatory medication.
Jerry was given a cervical collar and returned to the Lachney's home that night. Jerry testified at trial that he remained in bed for the following five weeks as per the instructions from the orthopaedist who examined him at the hospital.[2] Jerry stated that he took all of his meals in bed and did not even get out of bed to go to the bathroom. Jerry failed to keep his follow-up appointment at Huey P. Long Hospital two weeks following his accident.
On December 6, 1983, upon the advice of his attorney, Jerry went to see Dr. Newell Gauthier, Jr., a family practitioner in Cottonport. At that time, Jerry was complaining of severe pain and stiffness in his neck and back. Dr. Gauthier examined Jerry and found a marked degree of motion spasm in his neck. He also noted pain to palpation of Jerry's neck and back. Dr. Gauthier was unable to perform a complete examination of Jerry's back due to the severe amount of pain which Jerry professed. Dr. Gauthier also found a slightly decreased range of motion in Jerry's neck and back. Dr. Gauthier diagnosed Jerry's condition as an acute cervical neck strain and also a lumbosacral strain. Dr. Gauthier referred Jerry to an orthopaedic specialist.
Jerry was examined by Dr. C.W. Lowrey, an orthopaedic surgeon, on December 8, 1983. Jerry complained to Dr. Lowrey of neck and back pain along with headaches and blurred vision.[3] Dr. Lowrey found tenderness in the neck and lumbar areas, however, without any notable spasm in either. Dr. Lowrey found that Jerry had intermittent hyperventilation (rapid breathing) during the course of the examination. Dr. Lowrey opined that this was probably related to anxiety rather than to pain. The x-rays taken of Jerry's cervical spine were normal. Dr. Lowrey diagnosed that Jerry was suffering from possible lumbosacral and cervical strain with gross exaggeration and possible hysteria. Dr. Lowrey then recommended aspirin for the pain and an increase in Jerry's activity. Dr. Lowrey also recommended that Jerry begin weaning himself from use of the cervical collar.
Jerry saw Dr. Lowrey again on December 22, 1983. At this time, Dr. Lowrey found that Jerry's condition had improved in that his neck motion was almost back to normal and his back motion was possibly at the upper limit of normal. Dr. Lowrey observed that Jerry continued to display hyperextensive jerks when his neck and back were palpated, which Dr. Lowrey *207 found inconsistent with actual pain. At this time, Dr. Lowrey advised Jerry to stop using the cervical collar within ten days, increase his activity and return for a follow-up visit in three weeks.
Jerry did not keep his appointment with Dr. Lowrey, but instead returned for his final examination on February 29, 1984. Jerry told Dr. Lowrey that his neck felt a little better, but that he was still taking Anacin for the pain. Jerry still complained of pain and tenderness in the lumbosacral area and would moan when it was palpated. Dr. Lowrey also found that Jerry was cogwheeling (exhibiting jerking motions when turning his chin in either direction). Dr. Lowrey found that despite the cogwheeling, Jerry's range of motion in his neck showed a marked improvement. There was again no spasm noted in either the neck or the back areas. Dr. Lowrey opined that Jerry's condition had improved to the point where he needed no further treatment and therefore released him from his care. Dr. Lowrey noted that Jerry's complaints of pain were out of proportion to the physical findings and there were several discrepancies found in the various tests performed on Jerry. Dr. Lowrey concluded that Jerry was markedly exaggerating his symptoms.
In June of 1984, Jerry went to see Dr. Davidson H. Texada, Jr., a psychiatrist. Jerry complained to Dr. Texada of pain in his lower back, daily headaches, feelings of anxiety, loss of appetite, trouble sleeping and irritableness. The physical examination performed by Dr. Texada revealed no muscle spasm or limitation of motion. Jerry's reflexes and gait were also found to be normal. Dr. Texada prescribed a tranquilizer for Jerry.
Jerry returned to Dr. Texada at the end of June, complaining that there had been no change in his back pain and headaches. Dr. Texada found that Jerry was quite depressed. Dr. Texada then prescribed a combination tranquilizer and anti-depressant, which Jerry has been taking ever since. Jerry has been under Dr. Texada's regular care since that time. Dr. Texada last examined Jerry four days prior to trial. At that time, Dr. Texada found that Jerry was a little bit less depressed, but that his overall condition had not changed.
Dr. Texada's initial impression of Jerry's condition was that Jerry's symptoms were triggered by the fall and the injuries he sustained at that time. He also felt that there was a secondary gain factor in terms of a reason for Jerry to delay his commitment to marry Melinda.[4] Dr. Texada opined that the accident provided Jerry with a psychological reason for his inability to work at his new job as a carpenter's assistant. This new job meant marriage and all of the responsibilities that go along with marriage. Dr. Texada stated that the pain is exaggerated within Jerry's mind to serve as a defense mechanism against accepting adult responsibilities. Dr. Texada noted that Jerry became more anxious and depressed following his marriage to Melinda.
Although Dr. Texada has tried to encourage Jerry to partake in additional activities, Jerry claims that he is physically unable to do so. Dr. Texada could find no real basis for Jerry's physical complaints and observed that Jerry moves around like a person who is not experiencing much pain. Dr. Texada opined that Jerry was in need of psychiatric hospital care.
Upon the request of defendant, Jerry was examined by another psychiatrist, Dr. Paul D. Ware, on July 24, 1985. At this time, Dr. Ware observed that, although Jerry appeared to be quiet and withdrawn, there was no evidence that he was in any distress. Jerry did not show much emotion, but Dr. Ware did not feel that he exhibited a sad or depressed mood. Dr. *208 Ware did feel that Jerry was preoccupied with his injury and his disability.
Jerry complained to Dr. Ware of back pain, trouble sleeping, trembling hands, occasional intermittent headaches and a loss of sex drive. Dr. Ware performed a complete neurological examination on Jerry which revealed no evidence of muscle spasm, a normal gait, and a limited range of motion in his head and neck. Dr. Ware concluded that Jerry had an adjustment disorder to adulthood with depressed mood, a passive dependent personality disorder and was of slow learner intelligence. Dr. Ware opined that Jerry feels very trapped in his marriage and family and that he actually seems to be getting a great deal of secondary gain from his helpless role. Dr. Ware opined that Jerry's response to his injury was greatly exaggerated and that his responses to pain were voluntary. Dr. Ware concluded that Jerry's disorders, which are among the mildest form of psychiatric disease or disorders, were not related to the 1983 accident, but were brought on by other stressors in Jerry's life. Dr. Ware felt that the death of Jerry's father and his eventual marriage to Melinda were the most likely events (stressors) which brought about Jerry's disorders. Dr. Ware opined that since Jerry did not complain of his feelings of anxiety and depression until almost eight months after the accident, that such was not a likely stressor which could have brought on his type of disorder. Dr. Ware concluded that if Jerry were to have had a psychological reaction to the fall, it would most probably have occurred within three months following the accident. Dr. Ware stated in deposition that, "I think that proneness to exaggerate is a part of him [Jerry] that was operating before the accident and has continued to operate". Following his examination of Jerry, Dr. Ware could find no evidence of any neurological or psychiatric impairment which would interfere with Jerry's ability to perform any task.
At trial, Jerry testified that he no longer suffers from neck pain but his back still hurts when he tries to do anything. Jerry stated that he is unable to work because of the pain and that it even hurts him to walk. Jerry stated that he continues to take the medications prescribed by Dr. Texada, which helps to ease his pain. Jerry stated that he remains depressed because "... I don't know if I will ever go to work again or not". Jerry was 21 years old at the time of trial.
It is well settled that a reviewing court should not disturb the trier of fact's award for general damages absent an initial determination that the fact finder abused its discretion. Reck v. Stevens, 373 So.2d 498 (La.1979), and the cases cited therein.
In light of the evidence presented at trial, we cannot say that the jury erred in its award of medicals in the amount of $600.00 and $2,000.00 in general damages to plaintiff. The evidence indicates that, although Jerry remained in bed for five weeks following the accident, his need to have done so is seriously questioned. Five weeks after the accident, Dr. Gauthier did find some spasm in Jerry's neck and back but two days later no spasm was noted by Dr. Lowrey. In February, 1984, four months after the accident, Dr. Lowrey released Jerry from his care, as there were no longer any objective findings of injury. Jerry sought psychiatric care in June of 1984 from Dr. Texada. Apparently the jury chose to rely on Dr. Ware's findings over Dr. Texada's. We find no abuse of discretion in their doing so. As stated in Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200 (La.App. 1st Cir. 1982), writ denied, 429 So.2d 133 (La.1983), "... [t]he weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. [citations omitted]. The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. [citations omitted]." In our careful review of the record we are unable to say that the trial court abused its much discretion. Although it may be argued that the award is low, we cannot say that it falls below the lowest award which *209 was reasonably within the discretion of the trier of fact. Therefore, the plaintiff's damage award of $2,600.00 is affirmed.

DECREE
For the above and foregoing reasons, the judgment of the trial court is reversed insofar as it finds plaintiff, Jerry J. Bonnette, to be guilty of 50% comparative fault. In all other respects, the trial court's judgment is affirmed. Accordingly, the judgment of the trial court is amended and recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, JERRY J. BONNETTE, and against the defendants, K-MART, INC., and DAVID SHULTZ, in solido, in the full sum of TWO THOUSAND SIX HUNDRED AND NO/100 ($2,600.00) DOLLARS, together with legal interest on such sum from date of judicial demand until paid.
All costs at the trial level and on appeal are assessed to defendants.
JUDGMENT RECAST AND RENDERED.
NOTES
[1] Colton and Melinda Lachney testified that there was also a pair of earrings on the floor next to Jerry which Colton picked up and placed on the jewelry counter after the accident.
[2] The testimony of the orthopaedic physician who treated Jerry at the Huey P. Long Hospital was not presented at trial. The hospital report simply indicates a recommendation by the orthopaedist for "bed rest and heat". No specific time was designated in that report in regards to the amount of bed rest required.
[3] At trial, Dr. James Clifford Childress, Jr.'s deposition was admitted into evidence. Dr. Childress, an optometrist, testified that he examined Jerry on April 5, 1984 and determined that his headaches and blurred vision were more likely caused by the fact that Jerry was far-sighted than by his injury in the October 1983 accident.
[4] At the time of the accident, Jerry and Melinda were planning to be married two months later, in December. Because of the accident and Jerry's inability to work thereafter, the marriage plans were postponed. Jerry and Melinda were eventually married in October 1984, approximately a year following the accident, despite Jerry's continued claim that he was physically unable to work.