KNOLL, Judge.
St. Frances Cabrini Hospital (hereafter Cabrini) appeals a jury’s quantum award of $60,000 to Connie S. Lewis for damages he received while a patient at Cabrini when he accidentally sipped bleach with his noon meal. Cabrini does not contest liability; it contends that the jury’s $55,000 general damage award ($20,000 for physical pain and suffering, and $35,000 for mental pain and suffering) was excessive, and that the record does not support a special damage award of $5,000 for medical expenses. We amend, finding the damage award excessive.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury. LSA-C.C. Art. 2324.1. A finding of abuse must be based on the facts in the record. Reck v. Stevens, 373 So.2d 498 (La.1979). If we determine that the award should be lowered, we can only lower the award to the highest point which would have been within the trial court’s discretion. Bergeron v. Houma Hosp. Corp., 514 So.2d 1192 (La.App. 1st Cir.1987), writ denied, 517 So.2d 812 (La.1988).
On July 10, 1985, Lewis was hospitalized at Cabrini for treatment of back problems related to a worker’s compensation claim. Cabrini admitted that Lewis consumed a sip of bleach on July 10 from a plastic cup inadvertently placed on his meal tray; the cup was supposed to contain white wine for Lewis to have with his lunch.
Lewis testified that while eating his lunch, he reached for the cold cup, and took the swallow. He testified that he immediately felt his mouth and throat burning and he could not draw another breath. He told the jury that he crawled out of bed and made his way on his hands and knees to the bathroom where he began to repeatedly beat his chest to force himself to vomit so that he could breathe. In the bathroom, he vomited twice and started breathing again.
Lewis then enlisted the help of cleaning personnel working in the hallway and asked them to get him help. Nursing personnel then came to Lewis’ aid. After making a preliminary determination that the substance was bleach, the hospital contacted the Louisiana Poison Control Center for a recommended course of action. Acting on the poison control center’s advice, the nurses gave Lewis several glasses of water to drink. Lewis then spit up again.
Cabrini’s emergency room doctor was summoned, and Dr. David Carlton, Lewis’ treating physician, was notified. Cabrini’s administrative office also advised Lewis that the hospital would provide medical care for any treatment associated with his ingestion of bleach. Cortisone and an antibiotic were administered to Lewis, and his condition was monitored by the hospital staff through the rest of the day. Dr. Carlton also examined Lewis that night. Fie found nothing of significance, but asked Dr. James Pate, an ear, nose and throat specialist, to examine Lewis the next day. In addition, because Dr. Carlton found several loose teeth in Lewis’ mouth, he asked Dr. Marks, an oral surgeon, to perform an examination the following day.
On the following day, July 11, Dr. Pate examined Lewis at the request of Dr. Carlton. Dr. Pate’s examination revealed no abnormalities. Because of his negative findings, he cancelled a more detailed examination of the esophagus which had been scheduled. Dr. John Luke, a partner of Dr. Carlton, also examined Lewis that day. Dr. Luke testified that he found no signs of any real irritation or damage to Lewis’ oral cavity. As per Dr. Carlton’s request, Dr. Marks attempted to examine Lewis’ mouth, but Lewis became obstinate when Dr. Marks indicated that he could not associate *972 the loose teeth with the bleach ingestion, and the examination was terminated. Upon Lewis’ insistence, he was discharged from Cabrini that same day.
On the day of his discharge from Cabrini, Lewis consulted Dr. Warren J. Stassi, an otolaryngologist in Monroe. Lewis did not tell Dr. Stassi that he was advised that he ingested bleach or that this ingestion occurred in a hospital. Dr. Stassi did not observe anything abnormal about Lewis’ oral cavity; however, to rule out damage to the upper third of the esophagus which may have been caused by a lye burn, he recommended an esophagoscopy. Not wishing to be hospitalized in Monroe, Lewis returned to the Alexandria area with a note from Dr. Stassi stating his medical recommendations.
The next day Lewis returned to Cabrini because during the night his tongue was swollen and he had trouble breathing. Upon readmission, Lewis would not divulge Dr. Stassi’s name either to the nursing staff or Dr. Luke. Lewis only told them that a specialist had examined him and said that he was severely burned and he needed immediate hospitalization. At the time of readmission, Lewis complained of discomfort in the tongue and upper throat as well as upper epigastric discomfort. Dr. Luke’s physical examination showed only very mild redness in the oral cavity. Lewis’ medical condition was checked for several days, but no esophagoscopy was done. Lewis then was discharged.
A quick succession of doctors, all selected by Lewis, then followed shortly after Lewis’ discharge: Dr. Jonathan Forester, a general practitioner in Pineville; then Dr. Arturo Cid, a gastroenterologist, who did an esophagoscopy; and then Dr. Forester referred Lewis to Dr. Smith, an ear, nose, and throat specialist in Baton Rouge. None of these doctors testified at trial. Nevertheless, Mrs. Lewis testified that her husband told her that Dr. Cid had determined that he had a hiatal hernia. Lewis’ only testimony about Dr. Smith’s findings was that on the first examination he found scar tissue in the throat, and that on the second visit, Dr. Smith told him that there was no scar tissue present.
Finally, Lewis consulted Dr. Chesley Hines, Jr., an otolaryngologist at Ochsner Hospital in New Orleans, on February 5, 1986. Dr. Hines performed an esophago-scopic examination and found that Lewis suffered from esophagitis or inflammation at the lower end of his esophagus, but that there was no narrowing of the esophagus. He also found a hiatal hernia. Dr. Hines prescribed Reglan, a drug which helps the esophagus empty itself, and Tagamet, an antacid, to aid Lewis. Dr. Hines next saw Lewis in April 1986. At that second visit, Lewis told Dr. Hines that he no longer suffered heartburn and that his trouble with swallowing seemed to have resolved itself. An esophagram, an x-ray procedure, performed at this visit revealed no narrowing of the esophagus. Lewis was next treated by Dr. Hines on October 29, 1986. At that visit, Lewis again stated that he no longer had heartburn, but that he did have difficulty swallowing. Dr. Hines did a repeat esophagram which again showed that there was no narrowing of the esophagus. Thinking that maybe Lewis’ swallowing difficulty may have been linked to esophageal spasm, Dr. Hines prescribed niphedapine to relax the esophageal spasm. Dr. Hines never again saw Lewis for treatment.
Lewis next consulted Dr. Davidson Texa-da, an expert in psychiatry and neurology, on January 12, 1988. Dr. Texada summarized Lewis’ complaints since Dr. Hines last treated Lewis:
“... [H]e has also complained of an intermittent hoarseness of voice and the hoarseness is frequently or usually accompanied by enlargement of a gland on the left side of the forehead which usually comes and goes, he says, according to the hoarseness. [Dr. Texada witnessed the enlarged gland.] He says now that he has to chew slowly. He has some difficulty with swallowing if he eats too rapidly but he can handle liquids without any particular problem. He, at the time that I saw him, was depressed. He was quite anxious. There had been a very real fear of cancer resulting from this, *973 both because of the persistence of some swallowing difficulty, the hoarseness, and of course the appearance of the enlarged gland. He does say now that he has been reassured that he does not have cancer, at the moment this seems to be a fear that is either resolved or resolving. He realizes that he thinks too much about his condition which, he says, is due, he feels to the back pain [associated with his worker’s compensation injury which first required his hospitalization at Cabrini]. The back pain has kept him relatively inactive physically in comparison to his past life which gives him more time to think and become upset about his condition. He is also afraid that there may be necessary dilations in the future of the esophagus [a procedure whereby a tube is passed in the esophagus to stretch it and to make swallowing easier] and it was his understanding that physicians in New Orleans had told him that he could learn to do this himself. This was extremely frightening to him and upsetting to him.”
On these findings, Dr. Texada opined that Lewis was showing a significant amount of anxiety and depression, secondary to the esophageal problem. To ease Lewis’ problems, Dr. Texada prescribed Xanax, a tranquilizer. Dr. Texada further opined that Lewis’ anxiety would continue as long as the symptoms of the glandular enlargement and the hoarseness persisted.
The initial issue which the jury was presented with was the identification of the liquid Lewis swallowed. If it was lye, as Lewis contended, the damage to his body and the duration would be longer; if it was bleach, as contended by Cabrini, the damage to Lewis would have been minimal and his recuperative period would be lessened.
Without detailing the administrative chain of custody of the plastic cup which contained the liquid which we find well documented, we find that the evidence preponderates that the liquid in the cup was bleach. In May 1987 Jimmy Barnhill, an expert in the field of forensic chemistry, examined a plastic container labeled as being from Lewis’ hospital room, which held a white solid residue in the bottom of the cup.[1] After thoroughly testing the cup’s residue, Barnhill ruled out the possibility that it was lye, and opined that the test results were consistent with a finding that the residue was from bleach. Lewis presented no rebuttal chemical evidence.
Barnhill’s determination is supported by the medical evidence. Dr. Hines testified that his detailed examination of the esophagus revealed no narrowing; if lye had been ingested he would have expected to find narrowing of the esophagus caused by scar tissue formed from the lye burn.
Factors for consideration in the assessment of quantum for pain and suffering are the severity and duration thereof. Head v. St. Paul Fire & Marine Ins. Co., 408 So.2d 1174 (La.App. 3rd Cir.1982), writ denied, 412 So.2d 99 (La.1982).
Dr. Helmut M. Redetzki, an expert in pharmacology and toxology, and the director of Louisiana’s Poison Control Center, was called by Lewis as an expert witness. Although Dr. Redetzki testified about the repercussions of lye ingestion, he also opined that if a person swallowed a sip of bleach, as Lewis did, he would not expect very serious medical problems. If bleach was ingested, his recommendations were that a more serious medical workup was not called for, and that the course of treatment would consist of the administration of cortisone and prophylactic antibiotics. Dr. Redetzki further opined that there likewise is no expectation of long term detrimental medical effects associated with *974 the swallowing of a small amount of bleach.
Cabrini called Dr. Robert Culpepper, a local pediatrician, to testify because Dr. Hines had stated that pediatricians were the ones who most frequently treated individuals for ingested bleach, commenting that the problem was most common to children. Dr. Culpepper testified that he had seen a number of children who had consumed bleach, but that none of the individuals had long term impairment associated with the consumption of bleach, particularly the small amount Lewis consumed.
Two other causation questions were presented to the jury. First, the question was raised of whether the ingestion of bleach could have caused Lewis’ hiatal hernia. Without contradiction, the medical opinion was that this was not a possibility; Dr. Stassi went as far as to say that such a hypothesis was ludicrous. Second, could the bleach ingestion have inflammed Lewis’ esophagus? We find that the evidence does not preponderate that the ingestion of bleach caused this inflammation. Mrs. Lewis testified that Dr. Cid, a physician of Lewis’ choice, found that Lewis had a hia-tal hernia shortly after this episode at Cabrini, and Dr. Hines documented approximately six months after Lewis’ accident at Cabrini that Lewis had a hiatal hernia. Further, the unrefuted medical evidence was that one of the side effects of a hiatal hernia is the inflammation of the esophagus.'
Lewis did not enter into evidence the testimony of Dr. Forester, Dr. Cid, and Dr. Smith, three physicians who treated him independently from those recommended by Cabrini.
We do not wish to minimize Lewis’ trauma which occurred when he swallowed the bleach while he was hospitalized at Cabrini. However, on the record before us, we cannot find that the severity or the duration of his injuries justified a jury award of $55,-000. On the basis of. the evidence in the record, we find that the highest amount awardable was $27,500 ($10,000 for physical pain and suffering, and $17,500 for mental pain and suffering), and will amend the judgment accordingly.
Cabrini further contends that the jury’s award of $5,000 for medical expenses was not justified. We agree. It was stipulated that the unpaid medical expenses for the various physicians was $2,777.95. Lewis had not returned to Dr. Hines for further treatment, and Dr. Texa-da testified that Lewis’ mental state had improved with the prescriptive medication which was administered. No medical testimony was provided which estimated any amount for Lewis’ future medical treatment. Accordingly, we find that the $2,777.95 was the only medical expenses proven with any specificity for the jury to award. Therefore, we shall amend the judgment accordingly.
For the foregoing reasons, we amend the judgment of the trial court to reduce the amount of general damages to $27,500, and the amount of special damages for medical expenses to $2,777.95. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed one half to Lewis and one half to Cabrini.
AFFIRMED AS AMENDED, AND RENDERED.

. Several days after Lewis swallowed the liquid, Mary C. Neck, one of Cabrini’s assistant administrative officers, sent the contents of the plastic cup to EnvironMed Lab, an outside testing laboratory, for analysis. The original plastic cup was identified and photographed prior to Envi-ronMed’s involvement. Miss Neck retained the original cup, and asked EnvironMed to retain the contents after it completed the analysis. Despite Miss Neck’s instructions, EnvironMed failed to retain the contents of the plastic cup. The results of EnvironMed’s testing were not introduced into evidence. However, it was not disputed that this was the same cup Barnhill analyzed.