740 So.2d 186 (1999)
Steven ARBOURGH, Husband of/and Cynthia Arbourgh Individually and on Behalf of Steven Arbourgh, Jr.
v.
SWEET BASIL BISTRO, INC.
No. 98-CA-2218.
Court of Appeal of Louisiana, Fourth Circuit.
May 19, 1999.
Rehearing Denied September 15, 1999.
*187 David W. Bernberg New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Al M. Thompson, Matthew P. Chenevert, Berrigan, Litchfield, Schonekas & Mann, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY.
KIRBY, Judge.
Defendant, Sweet Basil's Bistro, Inc., appeals a trial court judgment in favor of plaintiffs, Cynthia and Steven Arbourgh, Sr., individually and on behalf of their minor son, Steven Arbourgh, Jr. We affirm.
Plaintiffs' petition for damages alleges that on June 23, 1995, Mr. and Mrs. Steven Arbourgh and their son Steven ate a meal at Sweet Basil's Bistro. Plaintiffs allege that as a result of this meal, Steven developed food poisoning and suffered illness and injury. Plaintiffs also claim that they suffered damages as a result of their son's illness. According to plaintiffs, the damages resulting to them and their son from this incident were caused by defendant's negligence.
The following is a summary of the testimony presented at trial. Cynthia Arbourgh, mother of Steven, testified that she and her husband and son arrived at the restaurant between 4:00 p.m. and 5:00 p.m. on June 23, 1995. Her son, who was seven years old at the time, ordered an item called chicken tenders. Mrs. Arbourgh requested that the parsley that was usually sprinkled on top of the tenders be left off. The order arrived with parsley, so the order was sent back. A second order without parsley on top arrived approximately five minutes later.
Steven complained to Mrs. Arbourgh that his food did not taste good, but she attributed this complaint to the fact that the family had not gone to the restaurant of her son's choice and her son did not eat much at that age. She said her son ate the ends of the chicken tenders only. After she finished her meal, Mrs. Arbourgh planned to eat the rest of her son's chicken. However, when she cut into one of the chicken tenders, she found that it was raw with red juices coming out of the middle. She did not eat the chicken after cutting into it.
After the family left the restaurant, they attended a baseball game in which Steven played. After the game, Steven refused his mother's offer of a snack, explaining that his stomach was upset. He did not eat anything else that day after eating the chicken at the restaurant. Steven slept well that evening. On Saturday morning, Steven woke up and complained that he was not feeling well. He did not leave the house all day Saturday and went to bed at approximately 9:00 p.m. During the night, Steven got up and told his mother he was not feeling well and then he vomited.
On Sunday morning, Steven experienced diarrhea, vomiting and fever. At that point, Mrs. Arbourgh called her son's pediatrician, Dr. Watts, who advised her to bring Steven to his office. Dr. Watts wanted a stool specimen from Steven but he was unable to produce one at that time. Dr. Watts sent them home with a container *188 for a stool specimen and advised them to return to the office as soon as one was obtained. Steven awoke early Monday morning in excruciating pain and vomited again. Because he was crying and in terrible pain, Mrs. Arbourgh telephoned Dr. Watts. Dr. Watts could hear Steven crying through the phone and while Mrs. Arbourgh was on the phone with Dr. Watts, Steven passed a bloody stool. Dr. Watts suggested that Steven be taken immediately to Children's Hospital.
Steven was admitted to Children's Hospital in the early morning hours of Monday, June 26, 1995. He was hospitalized for seven days. In the early part of that hospitalization, Steven was in extreme pain and his condition progressively worsened. The medical staff was initially unable to treat Steven for his condition because they were performing tests on the stool sample to try and determine what was causing his pain. He was unable to eat. On the third day of Steven's hospitalization, he was still in such excruciating pain that Mrs. Arbourgh pleaded with a nurse to give him something to alleviate the pain. The nurse explained to her that they could not give Steven anything that would mask his condition until they could determine the nature of his illness. Mrs. Arbourgh said that Steven suffered pain when he underwent a procedure used to determine the problem.
On the fifth day of Steven's hospitalization, a culture grown from the stool sample revealed campylobacter bacteria, which eating raw or undercooked chicken can cause. At that point, an IV with the proper medication was begun and Steven's condition began to improve. Up until that point, Mrs. Arbourgh was afraid that Steven was going to die. When Steven was released from the hospital seven days after his admission, he was still weak but otherwise felt fine. He has had no recurring problems from his illness caused by eating undercooked chicken. Within a week of his hospital discharge, Steven felt normal. Mrs. Arbourgh testified that Steven had not eaten any chicken in the two days before eating chicken at Sweet Basil's restaurant.
Dr. Charles Watts, who was qualified as an expert in pediatrics, testified that he saw Steven on Sunday, June 25, 1995 for complaints of abdominal pain, vomiting, diarrhea and fever. He was not able to identify a specific cause for these complaints. Mrs. Arbourgh reported to Dr. Watts that Steven had eaten undercooked chicken on the previous Friday. Dr. Watts' examination of Steven was normal. He wanted to obtain a stool specimen from Steven but Steven was unable to produce one during his visit. Dr. Watts sent Mrs. Arbourgh and Steven home with a container to collect a stool specimen from Steven. Dr. Watts did not see Steven again until July 5, 1995. One of Steven's physicians at Children's Hospital called him on July 2, 1995 to inform him that Steven's stool culture was positive for campylobacter bacteria. Dr. Watts testified that the symptoms for which he treated Steven on June 25, 1995 were consistent with the early stages of campylobacter bacteria.
Dr. Watts stated that uncooked chicken is a common cause of campylobacter bacteria. He said that another potential source of campylobacter bacteria is pets. Dr. Watts admitted that he did not know the incubation period for campylobacter bacteria.
Dr. Arturo Gastanaduy was qualified as an expert in the fields of pediatrics and pediatric infectious diseases. Dr. Brown at Children's Hospital contacted Dr. Gastanaduy on June 28, 1995 for an informal consultation to determine the cause of Steven Arbourgh's condition. At the time of the initial consultation, Dr. Gastanaduy suspected a bacterial type of infection. He recommended that several tests be performed. When he first examined Steven, he found him to be well hydrated and not in any acute distress. However, Steven cramped during the exam as though having abdominal pain. He said that when the laboratory reported that the stool culture *189 was positive for campylobacter bacteria, he was able to determine that this was the cause of Steven's symptoms. The stool culture was not positive for the bacteria until the third day of Steven's hospitalization.
Dr. Gastanaduy stated that he would usually not expect a normal contamination of campylobacter bacteria to result in a hospitalization of seven days. He stated that most patients with this type of bacteria could be treated on an outpatient basis. He said that strains of this type of bacteria could vary in severity. Dr. Gastanaduy stated that one of the most common sources of episodic occurrence of campylobacter bacteria is eating undercooked poultry. He said he did not determine the exact strain of the bacteria that infected Steven Arbourgh. His opinion was that Steven's case did not require a consultation from an epidemiologist because he did not feel there was any threat of mass contamination. Dr. Gastanaduy said that knowing that Steven ate raw chicken helped him in his differential diagnosis of the cause of his problem.
According to Dr. Gastanaduy, the incubation period for campylobacter bacteria can be anywhere from eighteen hours to seven days. He explained that the incubation period is the time between coming in contact with the bacteria and the time in which the symptoms start appearing. He stated that after an ingestion of campylobacter bacteria, the manifestation of a bloody stool would be expected within two to three days. Other symptoms include abdominal pain, fever and diarrhea. Dr. Gastanaduy was presented with a chronology of Steven's symptoms after allegedly eating raw chicken on Friday, June 23, 1995. His opinion was that it was more likely than not that this was a campylobacter infection from eating the raw chicken.
On cross-examination, Dr. Gastanaduy testified that the tests conducted on Steven Arbourgh did not reveal anything other than campylobacter bacteria. He stated that the discharge summary from the hospital included a nurse's admit note that stated, "almost immediate complaints of severe abdominal cramping two or three hours after eating undercooked chicken." He said that in a case of campylobacter bacteria ingestion caused by eating raw chicken, it would be unusual for someone to start with abdominal cramping or other symptoms almost immediately. He stated that he had never heard of a case with a two to three hour incubation period of campylobacter bacteria. Dr. Gastanaduy said that if the report of Steven's early onset of abdominal cramping were true, that fact coupled with his need for an unusually long hospital stay would prevent him from stating with certainty that eating the raw chicken in the restaurant was the cause of the campylobacter bacteria.
On redirect examination, Dr. Gastanaduy testified that, with the exception of the nurse's admit note in the hospital discharge summary stating that Steven's abdominal cramping began two to three hours after the ingestion of the chicken, all of the other symptoms recorded in the hospital's patient history and their progression are consistent with a Friday afternoon (June 23, 1995) ingestion of campylobacter bacteria. He said the patient's history indicated that he had a pet rabbit but rabbits are not listed among the animals that can produce campylobacter bacteria.
Dr. Raynorda Brown was qualified as an expert in pediatric gastroenterology. She first examined Steven on June 26, 1995 at Children's Hospital. He was in a cramped fetal position and in obvious discomfort when she first saw him. The examination was mainly focused on the abdominal area where Steven had tenderness. Dr. Brown performed a rectal examination that was positive for blood in the stool. Although the nature of Steven's problem could not be immediately determined, his symptoms were acute and suggested that this was something new and not a chronic condition. Steven was given intravenous fluids because *190 attempts at feeding him by mouth caused him too much discomfort.
Dr. Brown brought in Dr. Gastanaduy for a consultation to see whether or not he could further define any type of infectious disease in Steven. Dr. Brown was aware that Steven's history indicated that he had ingested raw chicken. She said that once the diagnosis of campylobacter was made, Steven was given medication to fight that particular type of bacteria and his condition began to improve and continued to do so. She stated that with regard to the incubation period for campylobacter bacteria, she would defer to the expertise of Dr. Gastanaduy on that issue. Her shift at the hospital ended on July 1, 1995, before Steven was released, and her next shift did not begin until after his release.
On cross-examination, Dr. Brown agreed that Steven's history as reflected in the hospital summary indicates that he had complaints of severe abdominal cramping two to three hours after eating undercooked chicken. She said that from the time the stool sample was taken, it took two days for the culture to grow that indicated the presence of campylobacter bacteria. She said she did not see the chicken that Steven ate.
Gerry Covington testified that she was the waitress who waited on the Arbourgh family at Sweet Basil's restaurant on June 23, 1995. At the time of trial, she was employed elsewhere. She said she recalled the family's visit to the restaurant that afternoon and she remembered the child ordering chicken fingers. Ms. Covington remembered that the child's mother sent back the chicken fingers because they arrived with parsley on them. She said another order of chicken fingers was cooked and she brought them to the table. She did not notice anything unusual about the appearance of the second order of chicken. Covington said she received no complaints about the second order of chicken and that no one mentioned that it was undercooked. She said the child ate some of the chicken and she packed the rest for the family to take home.
The trial judge asked Ms. Covington what it was about this family that caused her to have such a good memory of what occurred that afternoon. Her response was that the little boy had a toy with him that her own son also had and she played with him.
On cross-examination, plaintiff's counsel questioned Ms. Covington about how she remembered what this family ordered and ate two and one-half years earlier. She could not say what either of Steven's parents ate. She said approximately eight or nine minutes passed between the time she brought back the first order of chicken and the time she brought out the second order. Ms. Covington said that when she asked the Arbourgh family how the second order of chicken was, they replied that it was fine.
Mrs. Arbourgh continued her testimony under cross-examination. She said that she did not ask to have the charge for the order of chicken removed from their bill. She admitted that the second order of chicken had a brown crust. She said that on the day after their dinner at Sweet Basil's, she called the restaurant to tell them that her son had not been feeling well since eating chicken there and that they should make sure any chicken served was cooked thoroughly.
Mrs. Arbourgh testified that she operated a day camp for young children out of her home. Her son, Steven, and seven other children attended this day camp five days a week in June 1995. She said Steven did come in contact with the neighbor's dog during this period. She denied reporting that Steven had abdominal cramping two to three hours after eating the chicken. She also denied that Steven had cramping at that point in time.
Steven Arbourgh, Sr., the father of Steven, Jr., was the next witness. He described how difficult it was for him to witness his son in such terrible pain. He *191 mentioned watching his son suffer as the medical staff at Children's Hospital made several attempts at inserting an intravenous line in Steven before successfully accomplishing this task. He missed five days of work as a result of this incident. After his wife cut into Steven's chicken at the restaurant and commented that it was raw, Mr. Arbourgh looked at the chicken and described it at trial as "white, bright white, like paper and juicy." He said they did not ask that the remaining chicken be boxed so that they could bring it home. He said that during his son's hospitalization, there were times when he feared that his son would not survive.
Monica Senner testified that in June 1995, she was employed as manager of Sweet Basil's Bistro. She said she was present at the restaurant on June 23, 1995. She said that the waitress who served the Arbourgh family did not contact her that day to advise her that a portion of uncooked chicken had been served to the family. Senner said that the first time she heard about a problem with the meal served to the Arbourgh family was when she arrived at work on Saturday, June 24, 1995. At that time, she learned that Mrs. Arbourgh had called the restaurant to report that her son was sick and that she thought he had contracted salmonella from chicken. Senner spoke to the waitress who waited on the Arbourghs, Gerry Covington. Covington told her that the Arbourghs had not said anything to her about a problem with the chicken.
Senner learned that the restaurant had served forty-eight chicken breasts on June 23rd and no one reported getting sick from eating chicken. She said that she had eaten chicken at the restaurant that day and that she felt fine. She confirmed with the chef that the restaurant's procedures for cooking chicken had been followed. She said the Arbourghs called the restaurant again on Monday to report that their son was in Children's Hospital and to inquire about the restaurant paying their medical bills. Another employee at the restaurant received that call.
Senner said that the cooking time for chicken tenders is four to five minutes in a deep fryer with a basket. A chicken breast is cut into five or six strips and battered in a flour and milk preparation. The grease is heated to 400 degrees when the chicken is dropped in but the addition of the food drops the temperature of the grease to approximately 350 degrees. When Senner ate chicken tenders on June 23rd, the outside crust was golden brown and the chicken on the inside was white and juicy.
Senner stated that she had no personal knowledge as to whether or not the chicken ingested by Steven Arbourgh, Jr. was undercooked or raw. She said the description of the chicken given by Mr. Arbourgh in his testimony was consistent with the appearance of chicken that has been fully cooked.
Dr. Louise McFarland, chief epidemiologist for the State of Louisiana, was the next witness and was qualified as an expert in epidemiology. She said she is involved with the surveillance of infectious diseases and studies patterns of diseases to determine what bacteria or viruses cause certain diseases and what populations are likely to contract a particular disease. Dr. McFarland agreed that Steven Arbourgh's medical records show that the only disease identified in his system during his hospitalization was campylobacter bacteria. She stated that the incubation period for campylobacter bacteria is anywhere from one to ten days, but usually the minimum incubation period is two days. She said that based on the notation in the medical records that Steven had abdominal cramping only two to three hours after eating the chicken at Sweet Basil's restaurant, her opinion is that he contracted the campylobacter bacteria at some earlier date. Dr. McFarland said that she has never heard of a case of campylobacter bacteria with only a two to three hour incubation period. *192 She said that it is more probable than not that the chicken consumed by Steven on June 23, 1995 at Sweet Basil's restaurant was not the source of the campylobacter bacteria. She said that there was no way to determine whether the source of the bacteria was food or one of the other causes of this type of bacteria, such as contact with animals or contaminated water or another person who has come into contact with the bacteria.
Dr. McFarland testified that a temperature of 134 to 136 degrees kills campylobacter bacteria in one minute or less. She said that if the chicken tenders served to Steven were cooked at 350-400 degrees for at least four minutes, then it is highly unlikely that campylobacter bacteria would have survived if it had been present in the chicken.
On cross-examination, Dr. McFarland agreed that the most common cause of campylobacter transmission is the ingestion of raw poultry. She said that she had not seen the history taken of Steven by Dr. Watts the day before he was admitted to the hospital. She said she did not find any other potential source of contamination or infection in the materials provided to her regarding Steven, including medical records and depositions. Her opinion is that Steven ingested the bacteria either on Wednesday, June 21st or Thursday, June 22nd. She said that if Steven had ingested the bacteria from the chicken served at Sweet Basil's, then he would not have had any gastrointestinal symptoms until 1½ to 2 days later.
Dr. McFarland reviewed Dr. Watts' medical report regarding Steven Arbourgh at trial. She said Dr. Watts reported on symptoms that are consistent with gastrointestinal illness, but the report was not as detailed as the records from Children's Hospital and did not include a timeline of the symptoms or any determination as to the source of the symptoms. She said Dr. Watts just reported on the symptoms for which he was treating Steven on the day that he saw him. Dr. McFarland said that severe symptoms from campylobacter bacteria, such as bloody diarrhea and vomiting, do not normally appear only two days after ingestion.
Following trial in this matter, the trial judge rendered judgment in favor of plaintiffs and against Sweet Basil's Bistro, Inc. in the amount of $88,256.00, together with judicial interest from date of demand until paid, and all costs of the proceedings, including expert witness fees. This total amount included general damages and medical expenses. These elements of damages were itemized in the trial judge's written reasons for judgment. The defendant correctly notes that the total amount of itemized damages in the reasons for judgment is not the same figure as the amount of the award stated in the trial court judgment.[1] However, as plaintiffs correctly state, the reasons for judgment do not form a part of the judgment itself and in cases where there is a conflict between the judgment and the written reasons, the judgment controls. Edwards on Behalf of Edwards v. Saul, 93-1802 (La. App. 4 Cir. 5/26/94), 637 So.2d 1258, writ denied, 94-1729 (La.10/14/94), 643 So.2d 161.
On appeal, the defendant argues that the trial judge erred in finding that it was liable to plaintiffs for the illness suffered by Steven Arbourgh, Jr. Defendant claims that plaintiffs did not carry their burden of proving that the source of the bacterial infection was the food served by Sweet Basil's Bistro on June 23, 1995.
In a civil suit, the plaintiff bears the burden of proving his case by a preponderance of the evidence. Estate of Willis v. Cairns, 630 So.2d 805 (La.App. 3 Cir.1993). It is undisputed that Steven, Jr. consumed chicken at Sweet Basil's Bistro on Friday, June 23, 1995 between 4:00 p.m. and 5:00 p.m. It is also undisputed *193 that Steven became ill during that weekend, was admitted to Children's Hospital the following Monday and was diagnosed with having ingested campylobacter bacteria. Defendant argues that the testimony at trial showed that Steven could not have contracted the bacteria from the chicken eaten at Sweet Basil's Bistro because he experienced symptoms within only a few hours and the incubation period for this bacteria is at least one day. Defendant also claims that the evidence presented did not rule out other possible sources for this infection.
In written reasons for judgment, the trial judge found that Steven's food poisoning was, more likely than not, caused by the ingestion of raw and undercooked chicken served at the defendant's restaurant. As such, the trial judge found that the defendant restaurant breached its duties owed to its business invitees and that this breach caused plaintiffs to suffer damages.
The trial judge found that the combined testimony of Drs. Watts, Brown, and Gastanaduy showed that the child's food poisoning was caused by the ingestion of raw chicken on June 23, 1995. All of these physicians treated Steven and had an opportunity to evaluate and record the progression of his symptoms. The trial judge said that the opinion of these physicians was that raw chicken is, by far, the most likely cause of campylobacter infection and was the cause-in-fact of this disease. In her reasons, the trial judge also stated that the expert testimony of these physicians indicated that the progression with the child's symptomatology was consistent with the raw chicken ingestion and that the symptoms were, more likely than not, caused by the raw chicken. The trial judge noted that Dr. Louise McFarland, who testified for the defense, did not examine the child and her testimony was unclear as to the progression of the symptomatology related to a campylobacter infection, as well as to the possible causes of campylobacter infection and its incubation time.
In Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073, our Supreme Court set forth the standard of appellate review for cases involving factual findings as follows:
It is a well settled principle that an appellate court may not set aside a trial court's finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly wrong. Where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. The reviewing court must always keep in mind that if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently.
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Moreover, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. (citations omitted) Id. at p. 4-5, 666 So.2d at 1077.
In this case, the testimony of the expert witnesses differed on the issue of whether or not the chicken consumed by Steven *194 Arbourgh at Sweet Basil's restaurant was the cause of his infection with campylobacter bacteria. The trial judge indicated that she relied on the expert testimony of Drs. Watts, Brown and Gastanaduy over that of Dr. McFarland. Although neither Dr. Watts nor Dr. Brown specifically linked the chicken consumed by Steven at Sweet Basil's to his infection with campylobacter bacteria, Dr. Gastanaduy's testimony established the causal connection between the June 23, 1995 ingestion of chicken at Sweet Basil's and the campylobacter bacteria. His statement on cross-examination that he could not state with certainty that the June 23, 1995 ingestion of the chicken caused the bacteria was based on accepting as true that Steven suffered abdominal cramping within two to three hours of eating the chicken. In Mrs. Arbourgh's testimony, she denied that her son experienced abdominal cramping within two to three hours of the ingestion of chicken at Sweet Basil's restaurant. The only evidence indicating that Steven suffered abdominal cramping at that time was a nurse's admit note from Children's Hospital. Dr. McFarland's opinion that Steven contracted the bacteria at a date earlier than June 23, 1995 was based largely on the notation in the medical records that Steven had abdominal cramping within two to three hours of eating the chicken tenders. The trial judge apparently believed Mrs. Arbourgh's assertion that Steven did not experience abdominal cramping within two to three hours after eating at Sweet Basil's restaurant.
We conclude that the trial judge's credibility determinations in this case are reasonable and should not be disturbed by this court. Her factual findings are also reasonable in light of the record reviewed in its entirety. Because the plaintiffs carried their burden of proving that the chicken eaten by Steven Arbourgh, Jr. at Sweet Basil's on June 23, 1995 was the source of the campylobacter bacteria, this assignment of error is without merit.
In the second assignment of error, the defendant argues that the amounts awarded to plaintiffs for general damages were excessive and should be reduced. In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), our Supreme Court held that before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Only if an articulated analysis of the facts discloses an abuse of discretion is a resort to prior awards in similar cases proper. Reichert v. State, DOTD, 96-1419, 96-1460 (La.5/20/97), 694 So.2d 193, citing Reck v. Stevens, 373 So.2d 498 (La.1979).
In her reasons for judgment, the trial judge stated that she was impressed with the credibility of Mr. and Mrs. Arbourgh on the issue of damages. She found that the expert medical evidence presented by plaintiffs indicated that the child's infection was extremely severe and appeared to be life threatening in the early stages. The trial judge noted that the child's parents remained at his bedside throughout his hospitalization and were extremely fearful and anxious for his well being as his condition worsened and developed. She said the testimony of the parents evidenced the emotional trauma suffered by them. Their testimony also established their son's pain and suffering, including evidence of extremely high temperatures, bloody diarrhea, vomiting and extreme pain, combined with the possibility of death.
The trial testimony on the issue of damages, supports a finding that Mr. and Mrs. Arbourgh and their son, Steven, all suffered general damages as a result of Steven's illness and hospitalization for campylobacter bacteria caused by eating undercooked chicken. The trial judge's determination that Mr. and Mrs. Arbourgh's *195 testimony of this issue was credible is reasonable. Although we find the awards for general damages to be high, we conclude that they are not so excessive as to constitute an abuse of the trial judge's discretion. This assignment of error is without merit.
Finally, the defendant argues that the trial judge erred in casting Sweet Basil's Bistro, Inc. in judgment as a party defendant. According to defendant, the record is void of any evidence or admission that Sweet Basil's Bistro, Inc. was in the fact the owner and/or operator of the restaurant where the Arbourgh family ate. Defendant also argues that plaintiffs named multiple parties as the owner of the subject restaurant.
The issue of whether or not Sweet Basil's Bistro, Inc. was the owner of the Sweet Basil's restaurant was not raised at any time at the trial court level. The only party cast in judgment in this matter is Sweet Basil's Bistro, Inc. It is undisputed that Sweet Basil's Bistro, Inc. was named as a party in this litigation. The petition naming Sweet Basil's Bistro, Inc. as a defendant was served on its agent for service of process, Sharon Senner. Monica Senner testified that she was the manager of "Sweet Basil's Bistro." Prior to the testimony of Ms. Senner, defense counsel stated that she would be testifying as the corporate representative of Sweet Basil's because her family owns this business.
Although plaintiffs had the burden of proving that Sweet Basil's Bistro, Inc. was the owner of the restaurant, the testimony of Monica Senner combined with the above statement by defense counsel established this element by a preponderance of the evidence. No other evidence was presented to contradict the ownership of Sweet Basil's Bistro, Inc. The casting in judgment of Sweet Basil's Bistro, Inc. constitutes a factual finding by the trial judge that this entity owned the restaurant where Steven Arbourgh ate chicken on June 23, 1995. That finding was reasonable and will not be disturbed. This assignment of error is without merit.
For the reasons stated above, the trial court judgment is affirmed.
AFFIRMED.
NOTES
[1] The defendant did not file a motion to amend the judgment in the trial court.