STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

03-502

JAKE DIXON, ET UX.

VERSUS

DANIEL BUTANE GAS INC., ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NUMBER 205,333
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE

**********

BILLIE COLOMBARO WOODARD
JUDGE

**********

Court composed of Billie Colombaro Woodard, Michael G. Sullivan, and Billy
Howard Ezell, Judges.

AFFIRMED.

Howard N. Nugent, Jr.
Nugent Law Firm
Post Office Box 1309
Alexandria, Louisiana 71309-1309
(318) 445-3696
Counsel for Plaintiffs/Appellees:
    Jake Dixon
    Mamie Dixon

Brian T. Butler
5551 Corporate Blvd., Suite 3-C
Baton Rouge, Louisiana 70808
(225) 924-9585
Counsel for Defendant/Appellant:
    Daniel Butane Gas, Inc./Aeropres Corporation

WOODARD, Judge.

On appeal, Aeropres Corporation (Aeropres), which is a successor to Daniel Butane Gas Inc., requests that this court reverse the trial court's award of $15,000.00 in general damages to Jake Dixon. Mr. Dixon, Aeropres' customer, was injured when the pressure relief valve on his butane tank blew off while the Defendant's employee attempted to fill it with butane gas. Mrs. Dixon sought damages for her alleged loss of consortium, but the trial court did not address this issue, and she did not appeal her claim. We affirm the trial court's general damage award.

* * * * *

Daniel Butane Gas, Inc. provided Jake Dixon and his wife, Mamie Dixon, with butane gas for "quite a few years." On August 11, 2000, it sent a Daniel Butane truck to the Dixons' home to fill their butane tank. When it arrived, the driver of the truck handed Mr. Dixon a hose from the truck, which he attached to the butane tank. Soon after the exchange of butane gas had commenced, the pressure relief valve or pop-off valve was blown off the tank, causing butane gas to spew from it with great force.

Mr. Dixon described the force the explosion created: "[I]t was enough . . . that it knocked me down [and] . . . up against the fence and I was standing about [three feet] from the butane tank." When asked if the explosion knocked him out, he responded: "Well, it might have . . . for a couple of minutes." According to Mr. Dixon, the release of butane gas was powerful enough to damage "a big . . . magnolia" tree standing near the site of the accident. He recalled: "It burnt the leaves off of half of [the tree] where the butane went up through it."

After the explosion, the driver helped him get to his daughter's house that was only a short distance away. When he reached her home, he said: "[T]here's been an accident. . . . [I]t knocked him in the air. I think it knocked him out. He needs help." Mr. Dixon's daughter, Judy Dixon, and the driver placed him on the sofa. Judy called an Ophthalmologist, Dr. James W. Welch, Jr., who insisted that she bring her father to his office as soon as possible. Shortly afterwards, Dr. Welch treated the various injuries Mr. Dixon received to his eyes and chest.

The trial court found Jake Dixon to be free from fault while, on the other hand, it found Aeropres to be fully liable for the explosion. It awarded Mr. Dixon

$15,000.00 in general damages, $335.00 in special damages, $500.00 for his lost wages, court costs, and judicial interest from August 1, 2001 until paid.

Aeropres asserts on appeal that $15,000.00 is clearly excessive under the circumstances of this case, specifically, in light of his particular injuries and because of its belief that he should have completely healed in only one or two weeks.

\* \* \* \* \*

EXCESSIVE DAMAGES

An appellate court should rarely disturb an award of general damages in light of the great, and even vast, discretion vested in the trier of fact.[1]

Frequently, we encounter reasonable people who are in disagreement over the appropriate measure of general damages in a particular case.[2] However, "[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."[3]

Our supreme court disapproves of the use of a scale of prior awards in cases with similar medical injuries to decide whether the trier of fact abused its discretion.[4] Thus, the facts and circumstances of this case, alone, should determine the adequacy or inadequacy of the award.[5] Consequently, we must decide whether the award for Mr. Dixon's particular injuries, under the particular circumstances, is a clear abuse of the trier of fact's broad discretion.[6]

When the pop-off valve gave way, metal fragments blew into Jake Dixon's face, chest, and eyes. The force of the blast threw him into a fence, rendering him unconscious. His own undisputed account, as well as Judy and Mamie Dixon's

---

[1] *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

[2] *Id.*

[3] *Id.* at 1261.

[4] *Id.* (citing *Reck v. Stevens*, 373 So.2d 498 (La.1979)).

[5] *Id.*

[6] *Id.*

2

undisputed testimony, gave us a vivid description of his injuries and revealed the accident's effect on him and his lifestyle.

Before she took her father to the hospital, Judy remembered seeing blood under his left eye and "black stuff all over his face like BB shots." She also testified that it "looked like [he was] scalded" on his chest. Dr. Welch had already treated Mr. Dixon for his injuries when Mamie Dixon saw her husband for the first time after the accident. She noticed that the debris from the blast "chipped up" his chest and she could see bruising around his face. Her uncontested testimony, also, clearly described him as a sixty-nine-year-old man who had a relatively active lifestyle before the accident. This was in stark contrast to her portrayal of his condition at the time of trial. Specifically, she stated: "[A]fter [the accident] he couldn't do nothing. He goes and sits on the front porch in an old chair." Conversely, before, she remembered him to be more talkative and more able to help her around the house.

At the time of the accident, Jake Dixon and his wife were employed by Eugene Andries. Mr. Dixon's work duties consisted of helping his wife at Kincaid Boat Landing by putting boats in the water and selling gas and crickets. In addition to working at the boat landing, he did some work on Mr. Andries' farm. However, due to the butane tank explosion, it is undisputed that he could not work for "about three or four weeks" while he recovered from his injuries.

On August 11, 2000, the day of the accident, Dr. Welch treated him for the first time. Dr. Welch is a board-certified ophthalmologist. During this examination, he found "multiple tiny metal foreign bodies that were imbedded in the cornea and the conjunctiva in both eyes." He also had a "subconjunctival hemorrhage in each one of his eyes." After he removed "all the foreign bodies," he put an antibiotic steroid on the left eye and patched it "because it seemed to be the worst eye." In addition, he gave him "an antibiotic steroid drop to use in the right that night" and in both eyes thereafter.

Dr. Welch scheduled a follow-up visit for August 14, 2000, at which he noticed that Mr. Dixon's left cornea had "completely healed." However, in his right eye, he found yet another foreign body. He recalled: "I found a clear foreign body that was not metal. I don't know what it was; maybe a piece of clear plastic . . . [and] I removed that." Dr. Welch also asked him to continue using the steroid drops "until

3

[the drops] were gone or until his eyes had cleared up completely" because "[h]e still had some hemorrhaging there."

He examined his eyes again on September 18, 2000, which was the third and last examination. After the examination, Dr. Welch noted:

> When I examined him, *I could see still some small corneal scars in that right eye*, but the left eye was completely clear. The interior of the eye looked completely normal.

(Emphasis added.)

Aeropres maintains that his condition amounted to no more than a two-week injury and that Dr. Welch's testimony supports their contention. During a deposition, Dr. Welch was asked the following question:

> Q. How long do you think it would have been for [Mr. Dixon] to recover completely from the injuries he sustained to his eyes as a result of this incident?
>
> A. So that his vision was as good as it was before?
>
> Q. Yes.
>
> A. I *think* just in a week or two.

We must point out that Dr. Welch's answer is purely speculative because he did not examine Mr. Dixon a week or two after the August 11th accident. He only examined him three times. The first time was on the day of the accident, the second was three days later, and the last examination took place more than a month after the accident. Furthermore, when Dr. Welch examined him on September 18, 2000, he observed "some small corneal scars" in his right eye. Therefore, more than a month after the August 11th explosion, there was still evidence of the blast's heavy toll on Mr. Dixon's sixty-nine-year-old body.

When the trial court's findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong—standard mandates that we give those findings great deference.[7] "[O]nly the factfinder can be aware of the

---

[7]*Rosell v. ESCO*, 549 So.2d 840 (La.1989), *writ denied*, 561 So.2d 105 (La.1990).

4

variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."[8]  Moreover, "[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound."[9]

In his oral reasons for judgment, the trial judge explained:

> This court notes that it's just by the grace of God that this accident didn't result in the death or permanent injury of the Plaintiff.  This court believes that Mr. Dixon, and through his testimony, was very credible and further, [sic] the testimony of his daughter.  This court further believes that Mr. Dixon was, in fact, knocked unconscious at some point and that had it not been for the help of the driver in getting him to his daughter's house to be cared for, this incident may have been worse.  This court will not penalize a victim for not trying to run up medical expenses or go through a lot of different medical testing processes, *nor does this in any way minimize the injury that this court feels the victim has suffered.*

(Emphasis added.)

We cannot say that the trial judge abused his discretion in fixing this award of general damages.  Obviously, it is not the result of passion or prejudice, and it bears a reasonable relationship to the proved damages.[10]  "Many rational triers of fact could have decided that a lower award is more appropriate, but we cannot conclude from the entirety of the evidence in this record, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed [this award] of general damages at the level set by the trial judge."[11]  We also find that this is not one of those unusual cases where the award is so great that it is contrary to reason.[12]  Thus, we affirm.

---

[8]*Id.* at 844.

[9]*Lirette v. State Farm Ins. Co.*, 563 So.2d 850, 853 (La.1990).

[10]*Youn*, 623 So.2d 1257.

[11]*Id.* at 1261.

[12]*Id.*

## CONCLUSION

For the above reasons, we affirm the trial court's award of general damages and assess all costs of this appeal to Aeropres.

**AFFIRMED.**